INTERNATIONAL MINERALS & CHEMICAL CORPORATION, Plaintiff-Appellant, v. LIBERTY MUTUAL INSURANCE COMPANY, Defendant (Continental Insurance Company *et al.*, Defendants-Appellees).

First District (5th Division) No. 87—0505

Opinion filed March 25, 1988.—Rehearing denied April 29, 1988.

Robert A. Downing and Eugene A. Schoon, both of Sidley & Austin, of Chicago, for appellant.

Dowd & Dowd, Ltd., of Chicago (Michael E. Dowd, Nancy J. Gleason, and Philip J. McGuire, of counsel), for appellee National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

James J. O'Hagan, Victor J. Piekarski, and Brian J. Clarke, all of Querrey & Harrow, Ltd., of Chicago, for appellee Continental Insurance Company.

Terence E. Kiwala, of Rooks, Pitts & Poust, of Chicago, and Timothy C. Russell, Wilson M. Brown III, and Thomas S. Schaufelberger, all of Drinker, Biddle & Reath, of Washington, D.C., for appellees Lumbermens Mutual Casualty Company and American Motorists Insurance Company.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, and Davis, Polk & Wardwell, of New York, New York (James T. Ferrini, Paul R. Koepff, Richard R. Winter, and Margaret J. Orbon, of counsel), for appellees Central National Insurance Company of Omaha and California Union Insurance Company.

Haskell & Perrin, of Chicago (Thomas W. Murphy and Nancy K. Caron, of counsel), for appellee The Home Insurance Company.

Williams & Montgomery, Ltd., of Chicago (James K. Horstman, Barry L. Kroll, Anthony P. Katauskas, and Lloyd E. Williams, Jr., of counsel), for appellees Employers Commercial Union Insurance Company of North America and Employers Liability Assurance Corporation.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Edward J. Zulkey, of counsel), for appellees Employers Insurance Company of Wausau and Employers Mutual Liability Insurance Company of Wisconsin.

Phelan, Pope & John, Ltd., of Chicago (Robert J. Bates, Jr., and Maryann C. Hayes, of counsel), for appellees American Re-Insurance Company, Aetna Casualty & Surety Company and Affiliated FM Insurance Company.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, Robert E. Nord, and Lynn D. Dowd, of counsel), for appellees CNA Insurance Companies and Columbia Casualty Insurance Company.

Richard E. Mueller and Diane I. Jennings, both of Lord, Bissell & Brook, of Chicago, for appellees Certain Underwriters at Lloyd's, London, United States Fire Insurance Company, North River Insurance Company and International Surplus Lines Insurance Company.

Michael J. Merlo and Robert Marc Chemers, both of Pretzel & Stouffer, Chartered, of Chicago, for appellee Prudential Reinsurance Company.

Dowd & Dowd, Ltd., of Chicago (Michael E. Dowd, Nancy J. Gleason, and Philip J. McGuire, of counsel), for appellees Northbrook Excess and Surplus Insurance Company, Lexington Insurance Company, American Home Assurance Company, Granite State Insurance Company and Employers Mutual Insurance Company.

Pattishall, McAuliffe & Hofstetter, of Chicago, for appellees New England Reinsurance Company and First State Insurance Company.

James T. Price and Sandra L. Schermerhorn, both of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, for *amicus curiae* Illinois Manufacturers' Association.

Rudnick & Wolfe, of Chicago and Piper & Marbury, of Washington, D.C. (Don E. Glickman, Thomas W. Brunner, Laura A. Foggan, J. Douglas Wilson, and John W. Cavilia, of counsel), for *amicus curiae* Insurance Environmental Litigation Association.

JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from summary judgment for defendants in a declaratory judgment action.

The facts and events giving rise to this litigation have been presented to us by way of 15 briefs[1] and a nine-volume, 6000-page record, which we have attempted to condense in the following prefatory summary.

In January 1983, the United States, on behalf of the Environmental Protection Agency (EPA), filed a second-amended complaint in the United States District Court for the District of New Hampshire against International Minerals and Chemicals Corporation (IMC).[2] The complaint alleged that IMC had violated various provisions of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §6901 *et seq.* (1982) and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §9601 *et seq.* (1982)—also known as the Superfund Act—by reason of activities which resulted in environmental contamination at a Kingston, New Hampshire, barrel reconditioning facility which IMC had owned between May 1973 and August 1976, when it sold the site to Great Lakes Container Corporation (the GLCC site). The State of New Hampshire and the Town of Kingston, as intervening plaintiffs, also filed amended complaints asserting violations of State statutes and common law nuisance based on factual allegations substantively identical to those in the EPA complaint.

In April 1984, IMC, a New York corporation with its principal place of business in Northbrook, Illinois, filed this action in the cir-

---

[1]Several of the 27 appellees have submitted jointly prepared briefs focusing on specific points considered to be of particular relevance to their positions and interests while also adopting, or in some cases expanding upon, various arguments advanced in the other appellees' briefs.

[2]See *United States v. Ottati & Goss, Inc.* (D.N.H. 1985), 630 F. Supp. 1361. IMC was one of seven additional defendants joined in the *Ottati & Goss* action which was originally filed against 10 other defendants in May 1980.

cuit court of Cook County against six primary and 31 excess liability insurance carriers seeking a declaration that, contrary to their disclaimers of coverage, the insurers were obligated to defend it in the EPA action and/or to indemnify it for the amount of any judgments entered against it therein. Eleven of the insurers were dismissed as defendants following a determination by the trial court that the policies of insurance issued by them had time-expired or otherwise terminated prior to IMC's acquisition of the GLCC site in 1973. On September 9, 1985, IMC moved for partial summary judgment, declaring that the two remaining primary insurers, Continental Insurance Company and National Union Fire Insurance Company, owed a duty under their comprehensive general liability (CGL) policies to defend it in the EPA action. Continental and National Union filed answers, in which they raised various affirmative defenses, and cross-motions for summary judgment that they owed no duty to defend or indemnify IMC in relation to the EPA action. The excess insurers joined in the cross-motions for summary judgment as to the question of indemnification only, and on January 6 and January 21, 1987, the trial court entered orders denying IMC's motion for partial summary judgment and granting summary judgment in favor of all of the insurers. This appeal followed.

OPINION

█▌ █ Initially, we note that it is well settled in Illinois that the duties to defend and to indemnify are not coextensive, the obligation to defend being broader than the obligation to pay. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150; *Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245; *Murphy v. Urso* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079; *Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953; *Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 473 N.E.2d 405; *McFadyen v. North River Insurance Co.* (1965), 62 Ill. App. 2d 164, 209 N.E.2d 833.) The duty to indemnify arises only when the insured becomes legally obligated for a judgment in the underlying action, whereas the duty to defend an action against an insured stems from the commitment to defend expressly undertaken in the contract of insurance. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150.) In Illinois, as in most States, the existence of a duty to defend is determined by comparing the allegations of the complaint and the terms of the policy; if the complaint contains allegations which bring the

claims actually, or even potentially, within the coverage of the policy the insurer is obligated to defend. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150; *Clemmons v. Travelers Insurance Co.* (1981), 88 Ill. 2d 469, 430 N.E.2d 1104; *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24.) Thus an insurer may justifiably refuse to defend only where it is apparent from such a comparison that the allegations fail to state *any* claim within, or potentially within, the scope of policy coverage. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245; *Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 473 N.E.2d 405; *Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 466 N.E.2d 1091; *La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 408 N.E.2d 908.) Finally, where an exclusionary clause is relied upon to deny coverage, its applicability must be clear and free from doubt because any doubts as to coverage will be resolved in favor of the insured. *Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953; *Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 473 N.E.2d 405.

Turning first to the EPA complaint, for purposes of accuracy, factual understanding and continuity, we set forth in full those of the allegations directed against and/or relating to IMC.

"1. This is a civil action instituted pursuant to Section 7003 of the Resource Conservation and Recovery Act ('RCRA'), 42 U.S.C. §6973, and Section[s] 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ('CERCLA'), 42 U.S.C. §§9606 and 9607 for injunctive relief, restitution, and costs to remedy an imminent and substantial endangerment to health and the environment posed by the storage, disposal and release of hazardous wastes and substances, and for restitution concerning the release and threatened release of hazardous substances at two adjacent sites in Kingston, New Hampshire. *** The second site, known as the 'Great Lakes Container Corporation' site, was used for barrel reconditioning. As part of that business, [drums] containing industrial wastes were reconditioned and the wastes from reconditioning operation[s] were deposited onto and into the ground such that the disposal of wastes is contaminating soils, ground waters and surface waters.

* * *

20. Defendant, [IMC], is a corporation organized and existing under the laws of the State of New York. Its principal place of business is located [in] Northbrook, Cook County, Illinois. Defendant, [IMC] was the former owner and operator of the [GLCC] site.

* * *

46. The [GLCC] site is composed of approximately seven acres of land owned by Defendant, [GLCC], and an additional seven acres leased from Defendant, the Concord Realty Trust.

47. The site is unsecured by a fence, gate or other protective barrier.

48. Defendants, [IMC] and [GLCC], operated a barrel reconditioning business on the site. On this site, there was a storage area where up to 60,000 drums are stored pending reconditioning, a plant to recondition barrels, a small office and a storage area for reconditioned barrels.

49. In the course of reconditioning barrels, used barrels are emptied of all chemicals and other wastes and residues, washed and rinsed and stripped of rust by various industrial processes some of which include use of caustic solutions, physically dedented and tightened, tested, painted and sold.

50. Wastes from used drums in the reconditioning operation have been deposited and discharged on the ground of the [GLCC] site, and have been and are stored on the site.

51. Wastes discharged and deposited on the ground have contaminated the soil, migrated toward ground water and entered ground water.

52. Ground water has been and continues to be contaminated. The wells that provided drinking water in the [GLCC's] plant and office have been contaminated and defendant, [GLCC], has discontinued use of the wells for drinking water.

53. Ground water flow carries the contaminants towards the wetlands and Country Pond. The ground water is used by local residents as a drinking water supply.

54. Wastes deposited on the ground have entered and may enter surface waters.

* * *

91. 'Release' is defined in Section 101(22) of CERCLA, 42 U.S.C. §9601(22), to mean, in pertinent part, * * * 'any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.'

92. Releases, as defined in Section 101(22) of CERCLA, 42 U.S.C. §9601(22), of hazardous substances are occurring, have occurred, and threaten to occur from the [GLCC] site.

93. The acts and omissions of defendants, [GLCC] and [IMC] have caused the releases and threatened releases of hazardous substances from the [GLCC] site.

\* \* \*

99. Defendants, [GLCC] and [IMC], are jointly and severally liable to plaintiff, pursuant to Section 107 of CERCLA, 42 U.S.C. §9607, for all costs of removal and remedial action incurred to respond to the release and threatened release of hazardous substances from the above site."

All of the insurance policies contained substantially identical standard insuring and exclusionary provisions. Those pertinent to this appeal are the following:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. bodily injury or,

B. property damage;

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent \*\*\*."

An "occurrence" is defined in the general definition section at the opening of each policy as

"an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Each policy also contained a paragraph commonly referred to as a "pollution exclusion clause" within which is an exception to the exclusionary language. That paragraph provides:

"This insurance does not apply \*\*\* (f) to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Predictably, the issues have been stated and argued in almost as many forms as the number of briefs submitted. Reduced to the simplest terms, the ultimate question to be resolved is, of course, whether the trial court was correct in finding that the CGL policies before us afforded no coverage to IMC for the matters and events alleged in the EPA complaint and that the insurers were, therefore, entitled to summary judgment as matter of law.

At the outset, it should be noted that until now, no Illinois court has had occasion to address the precise issues presented here. However, as the multitude of cases cited by the parties and their *amici*[3] in their briefs and the appendices thereto evince, the CGL provisions at issue in this case have been the subject of a tremendous amount of litigation nationwide and have prompted extensive discourse in legal literature. Although practical considerations prohibit a comprehensive, detailed examination of all of the relevant authorities, we emphasize that we have reviewed and given serious consideration not only to those cases and treatises cited by and relied upon by the parties but also to materials found in the course of our independent research. We have been guided by and have benefitted from the reasoning and analysis of courts and commentators preceding us in addressing the issues now before us; indeed, as will be discussed further below, we have adopted, in large part, the approach of those jurists whose reasoning we have found to be most sound and persuasive. At the same time, however, we stress that while it has been helpful to look to other jurisdictions for guidance, because this is, essentially, a case of first impression in this State, we are not bound by those decisions but must decide this case in a manner consistent with the applicable principles of Illinois law.

■■ ■ Contracts of insurance are subject to the same rules of construction applicable to other types of contracts. (*Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 473 N.E.2d 405.) The paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement. (*Rivota v. Kaplan* (1977), 49 Ill. App. 3d 910, 364 N.E.2d 337.) If the language of the policy is ambiguous or otherwise susceptible to more than one reasonable interpretation, it will be construed in favor of the insured (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 429 N.E.2d 1203; *Glidden v. Farmers Au-*

---

[3]The Illinois Manufacturers' Association and the Insurance Environmental Litigation Association filed *amicus curiae* briefs in support of the arguments advanced by IMC and the insurers, respectively.

*tomobile Insurance Association* (1974), 57 Ill. 2d 330, 312 N.E.2d 247) under the doctrine of *contra preferentem*,[4] requiring that ambiguities be strictly construed against the drafter of the instrument (*United States v. Seckinger* (1970), 397 U.S. 203, 25 L. Ed. 2d 224, 90 S. Ct. 880). This doctrine is, as previously noted, particularly applicable to ambiguities in clauses purporting to take away coverage otherwise granted by the policy. (*Associated Indemnity Co. v. Insurance Co. of North America* (1979), 68 Ill. App. 3d 807, 386 N.E.2d 529.) However, when the language of the policy is clear and unambiguous, it will be applied as written. (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 429 N.E.2d 1203; *Stiefel v. Illinois Union Insurance Co.* (1983), 116 Ill. App. 3d 352, 452 N.E.2d 73.) In construing contracts of insurance, the court should neither distort the meaning of the words so as to reach a desired result nor search for or invent ambiguities where none exist but, rather, should examine the policy as a whole and, to the extent possible, give effect to all provisions and interpret words according to their plain, ordinary and popular meanings. *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872; *Cobbins v. General Accident Fire & Life Assurance Corp.* (1972), 53 Ill. 2d 285, 290 N.E.2d 873.

In the instant case the availability of any coverage for the claims asserted in the EPA complaint is dependent upon the applicability of only three brief clauses which must be read both sequentially and in the context of the others and the policy as a whole.

First is the standard, insurance-granting provision affording coverage for an "occurrence," a term defined in the policy as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

■ Notwithstanding the diversity of results reached in applying this definition to specific factual situations or in correlating it with the other policy provisions at issue, it has been generally agreed by courts and commentators alike that when considering the three components of the "occurrence" definition—the act or event, the injury or damage and the insured's mental state—to determine whether the general insuring provision has been triggered, the relevant inquiry is not whether the insured intended or expected the *event* resulting in the damage but whether he intended or expected the *damage* result-

---

[4]"Against the party who proffers or puts forward a thing." Black's Law Dictionary 296 (5th ed. 1979).

ing from the event. See, *e.g., United States Fidelity & Guaranty Co. v. Thomas Solvent Co.* (W.D. Mich. 1988), 683 F. Supp. 1139; *Claussen v. Aetna Casualty & Surety Co.* (S.D. Ga. 1987), 676 F. Supp. 1571; *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 340 S.E.2d 374; *Transamerica Insurance Co. v. Sunnes* (1985), 77 Or. App. 136, 711 P.2d 212; *Mraz v. American Universal Insurance Co.* (D. Md. 1985), 616 F. Supp. 1173; *Buckeye Union Insurance Co. v. Liberty Solvents & Chemicals Co.* (1984), 17 Ohio App. 3d 127, 477 N.E.2d 1227; *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.* (1982), 186 N.J. Super. 156, 451 A.2d 990; *Allstate Insurance Co. v. Klock Oil Co.* (1980), 73 A.D.2d 486, 426 N.Y.S.2d 603; *Steyer v. Westvaco Corp.* (D. Md. 1978), 450 F. Supp. 384; *Grand River Lime Co. v. Ohio Casualty Insurance Co.* (1972), 32 Ohio App. 2d 178, 289 N.E.2d 360; *Aetna Casualty & Surety Co. v. Martin Brothers Container & Timber Products Corp.* (D. Or. 1966), 256 F. Supp. 145; Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo. L. J. 1237 (1986); Note, *The Pollution Exclusion in the Comprehensive General Liability Insurance Policy,* 1986 U. Ill. L. Rev. 897; *cf. Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150 (in a declaratory judgment action concerning an underlying suit alleging asbestos injuries, the court stated that under the "occurrence" definition of a CGL policy the insurable event which gives rise to the insurer's obligation to provide coverage is not the exposure to conditions but the resulting bodily injury).

■ In other words, under the "occurrence" definition standing alone, any unintended/unexpected damage will be covered as an "accident" without regard to the nature of the event causing it, to whether that event took place gradually or instantaneously or to the insured's intentions or expectations as to its incidence. Only damage which is intended or expected by the insured is omitted from coverage. Thus, in keeping with the designation of these insuring agreements as "comprehensive, general liability" policies, the class of events which initially qualify for coverage as an "occurrence" under this provision is potentially unlimited.

The comprehensive general liability insuring provision is followed, however, by a series of exclusions which narrow the class of events for which coverage is afforded, the only one of which that is relevant here is the pollution exclusion clause quoted above.

IMC contends that the trial court erred in ruling that the pollution exclusion clearly and unambiguously operated to exclude coverage for the matters alleged in the EPA suit. In support thereof, it

asserts that the vast majority of courts which have examined the pollution exclusion clause, including this court in *Reliance Insurance Co. of Illinois v. Martin* (1984), 126 Ill. App. 3d 94, 467 N.E.2d 287, have found either that it is ambiguous and as such must be construed in favor of coverage or that it is merely a restatement of the "occurrence" definition and consequently excludes coverage only in those situations where the environmental contamination is intended or expected by the insured. (See, *e.g., United States Fidelity & Guaranty Co. v. Thomas Solvent Co.* (W.D. Mich. 1988), 683 F. Supp. 1139; *Peppers Steel & Alloys, Inc. v. United States Fidelity & Guaranty Co.* (S.D. Fla. 1987), 668 F. Supp. 1541; *Jonesville Products, Inc. v. Transamerica Insurance Group* (1986), 156 Mich. App. 508, 402 N.W.2d 46; *Payne v. United States Fidelity & Guaranty Co.* (S.D. Fla. 1985), 625 F. Supp. 1189; *Shapiro v. Public Service Mutual Insurance Co.* (1985), 19 Mass. App. 648, 477 N.E.2d 146; *CPS Chemical Co. v. Continental Insurance Co.* (1984), 199 N.J. Super. 558, 489 A.2d 1265; *Buckeye Union Insurance Co. v. Liberty Solvents & Chemicals Co.* (1984), 17 Ohio App. 3d 127, 477 N.E.2d 1227; *United Pacific Insurance Co. v. Van's Westlake Union, Inc.* (1983), 34 Wash. App. 708, 664 P.2d 1262; *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.* (1982), 186 N.J. Super. 156, 451 A.2d 990; *Allstate Insurance Co. v. Klock Oil Co.* (1980), 73 A.D.2d 486, 426 N.Y.S.2d 603; *Travelers Indemnity Co. v. Dingwell* (Me. 1980), 414 A.2d 220; *Lansco Inc. v. Department of Environmental Protection* (1975), 138 N.J. Super. 275, 350 A.2d 520, *aff'd* (1976), 145 N.J. Super. 433, 368 A.2d 363, *cert. denied* (1977), 73 N.J. 57, 372 A.2d 322.) Arguing that the EPA complaint does not allege how or when the hazardous substance releases occurred or that the resulting damage was intended or expected by it, IMC maintains that the clause does not operate to foreclose coverage for the claims asserted.

Without fully conceding that the overwhelming majority of courts have found the pollution exclusion clause to be ambiguous, the insurers collectively respond that even assuming so, the trend has now reversed and a substantial and growing number of recent cases have found that the clause is clear and unambiguous in excluding from policy coverage all pollution-related damage except that which occurs suddenly in time and accidentally. (See, *e.g., Borden, Inc. v. Affiliated FM Insurance Co.* (S.D. Ohio 1987), ___ F. Supp. ___; *International Surplus Lines Insurance Co. v. Anderson Development Co.* (E.D. Mich. 1987), ___ F. Supp. ___; *Claussen v. Aetna Casualty & Surety Co.* (S.D. Ga. 1987), 676 F. Supp. 1571; *Fischer & Porter Co.*

*v. Liberty Mutual Insurance Co.* (E.D. Pa. 1986), 656 F. Supp. 132; *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 340 S.E.2d 374; *Transamerica Insurance Co. v. Sunnes* (1985), 77 Or. App. 136, 711 P.2d 212; *Great Lakes Container Corp. v. National Union Fire Insurance Co.* (1st Cir. 1984), 727 F.2d 30; *Techalloy Co. v. Reliance Insurance Co.* (1984), 338 Pa. Super. 1, 487 A.2d 820; *City of Milwaukee v. Allied Smelting Corp.* (Wis. App. 1983), 117 Wis. 2d 377, 344 N.W.2d 523; *National Standard Insurance Co. v. Continental Casualty Co.* (N.D. Tex. 1983), ____ F. Supp. ____.) They maintain that in this case, the complaint alleges that IMC discharged and deposited toxic wastes onto the ground and into the water at the GLCC site as a part of its normal business operations and they urge us to follow the decision in *Great Lakes Container Corp. v. National Union Fire Insurance Co.* (1st Cir. 1984), 727 F.2d 30, the appeal brought by the firm succeeding IMC as owner and operator of the GLCC site wherein the court of appeals, presented with the same complaint and essentially the same allegations, affirmed the ruling of the district court that National Union's policy did not provide coverage for pollution alleged to have taken place as a concomitant of GLCC's regular business activity.

The singular point of agreement in this case seems to be that the two lines of cases supporting the parties' respective positions are irreconcilable.

One common feature of the general insuring and pollution exclusion provisions is that they are both quite broad in their scope. As discussed above, the comprehensive insuring provision grants coverage for all damage caused by an "occurrence," a term defined as an "accident," and in determining whether an accident has taken place the type and timing of the causative event are immaterial, the sole criterion being that the *damage* was unintended and unexpected from the standpoint of the insured. The pollution exclusion clause then removes from coverage all damage "arising out of the discharge, dispersal, escape or release" of pollutants into the environment (the polluting activity or event). Its focus is, first and foremost, on the nature of the event(s), *i.e.*, the discharge, dispersal, release or escape of pollutants and, then, on the nature of the damage caused thereby, *i.e.*, the environmental contamination. The existence of both elements triggers the exclusion clause, irrespective of the timing of the event or of the damage *and*—in sharp contrast to the insuring provision—without regard to the intentions or expectations of the insured as to either the happening of the event or the resulting damage.

In this case, the complaint alleges that in the course of the barrel

reconditioning process, the used barrels were emptied of all chemicals, wastes and residues; that those wastes were deposited and discharged on the ground; that they entered and contaminated the soil and groundwater on the GLCC site and that the acts and omissions of IMC caused the releases and threatened releases of hazardous substances from the GLCC site to ground and surface waters used by local residents.

Although the trial court made no express finding as to whether the allegations of the EPA complaint describe an "occurrence," in our view such a finding is inherent in its ruling that coverage was not available by reason of the pollution exclusion clause, for if there were no "occurrence," there would be no coverage in the first instance and it would be unnecessary to reach the question whether the pollution exclusion clause applied.[5] In any event, from our understanding of the "occurrence" definition and a comparison reading of the complaint, which was based on a strict liability statute, we cannot say that the damage resulting from the deposit of wastes from the barrels onto the ground was intended or expected from the standpoint of IMC so as to find that there was no "occurrence" and, hence, that the allegations did not assert claims at least potentially eligible for coverage under the general insuring provision of the policy.

■ At the same time, we are of the opinion that the allegations that IMC deposited and discharged hazardous wastes onto the ground which caused the contamination of the soil and groundwater on the site as well as the release and threatened release of hazardous substances into ground and surface waters used by local residents describe precisely the type of damage clearly and unambiguously removed from coverage by the language of the pollution exclusion clause—notwithstanding the happening of an "occurrence." In reaching this conclusion, we applied the analysis set forth above and considered two simple questions: (1) Did the complaint allege a discharge, dispersal, release or escape of pollutants upon land or into water? and (2) Was it alleged that that discharge, dispersal, release or escape resulted in pollution damage? The answer to both questions

---

[5]The court of appeals in *Great Lakes Container Corp. v. National Union Fire Insurance Co.* (1st Cir. 1984), 727 F.2d 30, which the insurers urge us to follow, does not, apparently, share that view. In that case, the court found that "[t]here is no 'occurrence' within the meaning of the policy alleged [by the EPA complaint]" but, curiously, in the immediately preceding sentence it also stated, that "[p]roperty damage resulting from [regular business activity] falls squarely within the language of [the pollution exclusion clause.]" 727 F.2d at 33-34.

being "yes," there can be no question as to the applicability of the pollution exclusion.

In view thereof, the only remaining inquiry is whether the complaint alleges matters which qualify under the exception within the exclusion clause for restoration of the coverage otherwise excluded thereby. Although it is the shortest of the three clauses under examination, it is, without question, the one which has been construed and applied in the greatest number of different ways and has generated the most controversy.

At the risk of being repetitive or perhaps even simplistic in explaining our decision, we believe that a correct interpretation of the exception requires a word-by-word analysis of it. The exception provides that the pollution exclusion clause does not apply if the discharge, dispersal, release or escape referred to in the exclusion is sudden and accidental.

Whereas the general insuring provision focuses only on the damage and the pollution exclusion clause focuses on the event or activity as well as on the nature of the damage, the exception is concerned only with the event or activity—the discharge, dispersal, release or escape of pollutants. If that discharge, dispersal, release or escape is *both* sudden and accidental, coverage removed by the exclusion is restored.

■ Considering first whether the events here constituted an "accidental" event, we return to the "occurrence" definition where the term "accident" is first used in the policy. That definition speaks of an accident in terms of the intentions and expectations of the insured. Thus, we interpret the exception to provide that if the discharge, dispersal, release or escape of pollutants is unintended and unexpected from the standpoint of the insured, it has met one of the two prerequisites for reinstatement of coverage.

That portion of the EPA complaint directed against IMC alleges in relevant part that IMC operated a barrel reconditioning business on the GLCC site; that on the site was a storage area where up to 60,000 barrels were stored pending reconditioning; that in the course of the reconditioning process the barrels were emptied of all chemical wastes and residues and then washed, rinsed and stripped of rust by various industrial processes, including the use of caustic solutions; that the wastes from the drums were deposited and discharged onto the ground at the site; that those wastes contaminated the soil, migrated to, entered and contaminated the groundwater, the flow of which carried contaminants into the ground and surface waters used by local residents.

While we agree with IMC that a complaint need not allege or use language affirmatively bringing the claim(s) within the scope of the policy (*Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953), as the question of coverage should not hinge exclusively on the draftsmanship skills, or whims, of the plaintiff in the underlying action (see, *e.g., Travelers Indemnity Co. v. Dingwell* (Me. 1980), 414 A.2d 220), it is, if not incredulous, highly unlikely that IMC did not, at the very least, expect that a discharge, release or escape of toxic wastes into the soil and groundwater—if not the contamination thereof—would occur either while the barrels were stored on the site awaiting emptying and reconditioning or during the washing/rinsing/stripping process—or both. We recognize, however, that "highly unlikely" equates with "improbability," not "impossibility," and thus leaves a remote potentiality that the discharge, release or escape of hazardous substances from the barrels was neither intended nor expected by IMC and could, arguably, be characterized as "accidental" for purposes of the exception.

■ However, given even the most liberal reading, we can find nothing in these allegations from which it might be said, or even implied, that the discharge, dispersal, release or escape was "sudden." In so holding, we recognize that there are several recent cases among those we cited earlier as being supportive generally of arguments made by IMC in which the courts have found coverage for claims based on allegations which, though not identical, are not readily distinguishable from those before us on the ground that in addition to its temporal connotation the word "sudden" means, or at least may also mean, "unintended and unexpected." (See, *e.g., United States Fidelity & Guaranty Co. v. Thomas Solvent Co.* (W.D. Mich. 1988), 683 F. Supp. 1139; *Peppers Steel & Alloys, Inc. v. United States Fidelity & Guaranty Co.* (S.D. Fla. 1987), 668 F. Supp. 1541; *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.* (1987), 218 N.J. Super. 516, 528 A.2d 76; *Jonesville Products, Inc. v. Transamerica Insurance Group* (1986), 156 Mich. App. 508, 402 N.W.2d 46.) Although the facts, findings and underlying reasoning differ somewhat, generally the courts which have ruled that the pollution exclusion clause did not bar coverage have syllogized that because "sudden" may also mean "unintended" and "unexpected," either (a) the exception to the exclusion is merely a restatement of the "occurrence" definition incorporated into the general insuring provision and thus affords coverage for polluting events so long as they are unintended and unexpected by the insured and/or (b) the word "sudden" is so ambiguous as to render the exclusion ineffective.

■■ In our view, this reasoning is seriously flawed for at least two reasons. First, interpreting "sudden" as "unintended and unexpected" renders it synonymous with "accidental," as that term is employed in the policy and thus, the word "accidental" can be read out of the exception as nothing more than redundant surplusage. Such a reading does not comport with fundamental rules of contract construction requiring that to the extent possible, all words used in a contract be given effect. *Cobbins v. General Accident Fire & Life Assurance Corp.* (1972), 53 Ill. 2d 285, 290 N.E.2d 873.

Second, we believe, as did the courts in *Borden, Inc. v. Affiliated FM Insurance Co.* (S.D. Ohio 1987), ___ F. Supp. ___, *International Surplus Lines Insurance Co. v. Anderson Development Co.* (E.D. Mich. 1987), ___ F. Supp. ___, *Claussen v. Aetna Casualty & Surety Co.* (S.D. Ga. 1987), 676 F. Supp. 1571, *Fischer & Porter Co. v. Liberty Mutual Insurance Co.* (E.D. Pa. 1986), 656 F. Supp. 132, *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 340 S.E.2d 374, *Transamerica Insurance Co. v. Sunnes* (1985), 77 Or. App. 136, 711 P.2d 212, *Techalloy Co. v. Reliance Insurance Co.* (1984), 338 Pa. Super. 1, 487 A.2d 820, *City of Milwaukee v. Allied Smelting Corp.* (Wis. App. 1983), 117 Wis. 2d 377, 344 N.W.2d 523, and *National Standard Insurance Co. v. Continental Casualty Co.* (N.D. Tex. 1983), ___ F. Supp. ___, that "sudden" is understood in its ordinary, most common and popular sense to have a temporal significance. Webster's dictionary defines "sudden" as "happening without previous notice or with very brief notice"; "abrupt"; "characterized by or manifesting hastiness" (Webster's Third New International Dictionary 2284 (1986)); and we decline to ignore these temporal-focused definitions or hold that because the word might also have other contextual uses, it is ambiguous and thus must be interpreted to provide coverage where the policy language read as a whole clearly intends to exclude such coverage.

In this case, it cannot reasonably be said that the discharge, dispersal, release and/or escape of hazardous wastes from the barrels into the soil on the site and the groundwater under it and the resulting flow, or dispersal, of those pollutants into local ground and surface waters occurred without or on brief notice, abruptly or hastily so as to constitute "sudden" events for purposes of the pollution exclusion exception.

Finally, we address IMC's argument that this court, in *Reliance Insurance Co. v. Martin* (1984), 126 Ill. App. 3d 94, 467 N.E.2d 287, has previously interpreted the pollution exclusion clause and found it to be ambiguous. In *Reliance*, the plaintiffs in the underlying suit

sought recovery for personal injury and property damage allegedly caused by the regular escape of carbon monoxide and soot into their condominium unit from Martin's adjacent parking garage. Reliance refused to defend or indemnify Martin on the basis of the pollution exclusion clause and thereafter filed a declaratory judgment action. In reversing summary judgment for Reliance, the court quoted *Allstate Insurance Co. v. Klock Oil Co.* (1980), 426 N.Y.S.2d 603, 73 A.D.2d 486, wherein the New York court stated that "the word 'sudden' as used in liability insurance need not be limited to an instantaneous happening. The term 'sudden and accidental' must be construed in its relevant context [which is] that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured. Thus, regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the fact finder, the total situation could be found to constitute an accident [citation] ***." 426 N.Y.S.2d at 605, 73 A.D.2d at 488-89.

The *Reliance* court reasoned:

"Under this analysis the relevant question is not the time frame involved but whether Martin Co. *** could have intended or expected carbon monoxide and soot to enter the *** condominium unit. Although, clearly, the operator of a parking garage must expect to release fumes and soot into the facility itself, as well as into the air and streets, it is not equally clear that he should expect to release soot and fumes into adjacent residential structures. We believe this constitutes a question of fact [requiring reversal of summary judgment for Reliance]." *Reliance*, 126 Ill. App. 3d at 98, 467 N.E.2d at 290.

Initially, we note from the above that contrary to IMC's representation, the *Reliance* court did not rule that the pollution exclusion clause was ambiguous. Rather, the court based the reversal of summary judgment on its finding that there was a question of fact regarding whether the release of soot and fumes could be found to be sudden and accidental.

In any event, for the reasons stated throughout this opinion, to the extent that *Reliance* adopted the reasoning in *Klock* and/or stands for the proposition that "sudden and accidental" is, as the *Klock* court implied, a singular, albeit two-word, term which is to be construed as meaning "unintended and unexpected," with reference to the mental state, *i.e.*, intentions and expectations, of the insured we think it is incorrect and respectfully but unhesitatingly decline to follow it.

In light of our decision that summary judgment was properly

granted in favor of the insurers on the basis of the pollution exclusion clause, it is unnecessary to reach the remaining issues and arguments presented by the parties.

For the reasons stated, the order granting summary judgment for the insurers is affirmed.

Affirmed.

PINCHAM and MURRAY, JJ., concur.