In the

# United States Court of Appeals

### For the Seventh Circuit

———————

Nos. 02-1500 & 02-1501

INDIANA INSURANCE COMPANY,
an Indiana corporation,

*Plaintiff-Appellee,*

*v.*

PANA COMMUNITY UNIT SCHOOL DISTRICT NUMBER 8,

*Defendant-Third Party
Plaintiff-Appellant,*

*v.*

INSURANCE MANAGEMENT BUREAU, also known as
Independent Risk Managers, Inc.,

*Third Party
Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-C-3121—**Richard Mills**, *Judge.*

———————

ARGUED SEPTEMBER 25, 2002—DECIDED DECEMBER 31, 2002

———————

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.*  In 1992, Defendant-Appellee
Indiana Insurance Company ("Indiana") issued an insur-

ance policy to PANA Community School District Number 8 ("PANA") for property and casualty insurance. After making payments to PANA following a fire which damaged its property, Indiana filed a complaint for declaratory judgment seeking a judicial declaration that it had fully satisfied its contractual obligations to PANA. PANA filed a counterclaim for breach of contract. The district court granted Indiana's motion for partial summary judgment and denied PANA's motion for summary judgment. PANA appeals, arguing that the district court erred in its summary judgment determination. For the reasons set forth below, we conclude that the district court correctly granted summary judgment and affirm.

## BACKGROUND

PANA is a municipal corporation organized under the Illinois School Code that provides public educational services to students through two elementary schools, a junior high school, a senior high school, and an adult educational center. Among the buildings that PANA owns is a junior high school, which consists of a north and south building. The north building is approximately 35,000 square feet and the south building is less than 19,000 square feet. Classes are held in the north building while the south building has been used for storage since the Illinois Department of Education condemned the building in 1981 or 1982.

Under Section 5/10-20.21 of the Illinois School Code, PANA must publicly bid contracts in excess of $10,000.00. In 1992, PANA, acting through its insurance consultant, Insurance Management Bureau ("IMB"), issued bid specifications soliciting proposals for property coverage for the various school buildings owned by PANA. The bid specifications requested blanket coverage on a replacement cost basis for all buildings unless otherwise noted. Replacement

cost value is the cost of replacing the property in like utility without deduction for depreciation. The bid specifications provided that the south building of the junior high school was to be insured at a value of $50,000.00 for demolition and debris removal only. Indiana, through Richard A. Lees, a licensed insurance producer, submitted a proposal pursuant to the bid specifications that was accepted by PANA. Indiana issued an insurance policy which provided coverage for the south building of the junior high school in the amount of $50,000.00 but did not include the south building under the blanket coverage provisions, valuing its replacement cost as "0."

Indiana issued renewal policies to PANA from 1993 through 1995, continuing to exclude the south building from blanket coverage and providing only $50,000.00 coverage for demolition and debris removal for the south building.

In 1995, PANA's new superintendent of schools, Larry Marsh, hired ValueQuest International, Ltd. (ValueQuest) to appraise the replacement cost of all of PANA's buildings. ValueQuest prepared a report that reflected a replacement cost for the junior high school of $1,872,396.00.

In 1996, PANA decided to rebid its insurance needs, requesting that IMB lay the groundwork for the rebidding process. While working on the rebidding project, IMB reviewed the ValueQuest report and discovered a discrepancy between the ValueQuest appraisal of the junior high school and the replacement cost of the junior high school set forth in the 1995 statement of values. Larry Marsh explained to the IMB representative, Renee Smith, that the ValueQuest appraisal did not incorporate a value for the south building of the junior high school.

In March 1996, Renee Smith sent a fax to Larry Marsh confirming the discrepancies in the different evaluations of the junior high school. She also recommended that

PANA should fully insure the south building. Based on this advice, Marsh obtained the services of the school district's architects, Gatewood Hance & Associates, to appraise the junior high school. Gatewood Hance & Associates prepared a building replacement cost estimate reflecting an appraisal of the PANA junior high school buildings at 35,730 square feet with replacement cost of $2,325,920.00. After receiving the Gatewood appraisal of March 14, 1996, Smith assumed that the figure of 35,730 square feet pertained to the South Building.

On March 15, 1996, Smith prepared to incorporate several modifications to the PANA bid specifications. These changes included combining the replacement cost of $1,616,031.00 established by ValueQuest for the north building with the replacement cost of $2,325,920.00 estimated by Gatewood. Smith also intended to specify that blanket coverage was wanted for both junior high school buildings.

While in the process of implementing these changes to the 1996 bid specifications, IMB came under new ownership. However, after an abrupt change of ownership, the new owner, Debra Callen, ordered Smith's computer to be turned off and the changes to the 1996 bid specifications were lost.

When IMB published the 1996 bid specifications, they did not include Smith's modifications. Thus, neither Indiana nor Richard Lees were ever made aware of Smith's attempted modifications. The statement of values for the 1996 bid specifications listed the replacement cost for the north building as $1,616,031.00 and "0" for the south building. In addition, the 1996 bid specifications required blanket coverage for all of PANA's buildings according to the building's replacement cost. The statement of values for the 1996 bid specifications appeared as follows:

### STATEMENT OF VALUES

| Item No. | Specify A Building | B Personal Property of the Insured | | Repl. Cost |
|---|---|---|---|---|
| 1. | Administration Building | | A | 444,183 |
| | 14 East Main Street, Pana, Illinois | | B | 783,250 |
| 2. | Pana Adult Center | | A | 414,045 |
| | 400 West Orange, Pana, Illinois | | B | 93,706 |
| 3. | Washington School | | A | 2,562,911 |
| | 200 South Sherman, Pana, Illinois | | B | 370,455 |
| 4. | Lincoln School | | A | 2,416,739 |
| | 614 East Second, Pana, Illinois | | B | 402,083 |
| 5. | Senior High School | | A | 5,123,472 |
| | 201 West Eighth, Pana, Illinois | | B | 1,304,609 |
| 6. | Tool Shed (at High School) | | A | 5,791 |
| | 201 West Eighth, Pana, Illinois | | B | 4,624 |
| 7. | Storage Building (at High School) | | A | 10,857 |
| | 201 West Eighth, Pana, Illinois | | B | 10,356 |
| 8. | Junior High Building (North Building) | | A | 1,616,031 |
| 9. | Junior High Building (South Building) | | A | 0 |
| 10. | Contents of Junior High Buildings (North & South) | | B | 356,355 |
| 11. | Property in the Open at Items 1-10 | | | 46,239 |
| | TOTAL: | | | 15,965,706 |

On May 20, 1996, PANA awarded Indiana the contract for casualty and property insurance coverage from July 1996 through June 1997. The contract went into effect on July 1, 1996, and was renewed for a one-year period

running from July 1, 1997 to July 1, 1998. On July 1, 1996, Indiana issued the insurance policy to PANA. Since the south building was not assigned a replacement or insurable value, Indiana did not charge a premium for blanket coverage of the south building.

On October 4, 1997, fire damaged both junior high school buildings. Indiana investigated, adjusted, and paid all components of the claim submitted by PANA pursuant to the Indiana policy with the exception of PANA's claim for structural damage to the south building. Indiana did, however, pay PANA $50,000.00 pursuant to the demolition and debris removal coverage for the south building provided by the 1997 policy. When PANA sought payment for replacement costs for the south building, Indiana denied PANA's claim based upon the 1997 policy. Shortly thereafter, Indiana filed its initial complaint seeking declaratory relief.

In response to Indiana's complaint, PANA filed an answer, a counterclaim for breach of contract and reformation, and a third-party complaint against IMB, the agent who issued the Indiana policy. On December 3, 2001, the district court entered an order granting Indiana's motion for partial summary judgment and denying PANA's cross motion for summary judgment. The district court then relinquished pendent jurisdiction over PANA's third-party complaint, thereby dismissing the case in its entirety. In reaching its decision, the court determined that the insurance policy unambiguously limited liability and thus Indiana was not liable for the replacement costs of the south building of the junior high school.

## ANALYSIS

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Spearman v. Ford Motor*

*Co.*, 231 F.3d 1080, 1084 (7th Cir. 2000). A decision granting a motion for summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Rivera v. Grossinger Autoplex*, 274 F.3d 1118, 1121 (7th Cir. 2001). Judgment as a matter of law is proper when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This case concerns a diversity suit for breach of contract. The parties do not contest that Illinois law applies to the substantive issues. When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

## I. *Interpreting PANA's Blanket Insurance Contract*

In construing an insurance policy, a court must ascertain the intent of the parties to the contract. *Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*, 522 N.E.2d 758, 764 (Ill. App. Ct. 1988). To ascertain the meaning of the policy's words and the intent of the parties, we construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract. *See, e.g.*, *Zurich Ins. Co. v. Raymark Indus., Inc.*, 514 N.E.2d 150 (Ill. 1987); *Dora Township v. Ind. Ins. Co.*, 400 N.E.2d 921 (Ill. 1980). Illinois law requires that provisions of an insurance agreement be interpreted in the factual context of the case. *Putzbach v. Allstate Ins. Co.*, 494 N.E.2d 192, 195 (Ill. App. Ct. 1986).

PANA argues that no language within Indiana's insurance policy or the 1996 bid specifications expressly

excluded the south junior high school building from coverage. PANA quotes a Fourth Circuit decision which describes a blanket policy as one which "invariably covers and attaches to every item of property described in the policy and insures the property collectively." *Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Assoc. Ins. Co.*, 176 F.3d 794, 799 (4th Cir. 1999), *quoting Nat'l Bank v. Fid. and Cas. Co.*, 125 F.2d 920, 924 (4th Cir. 1942). PANA then notes there were no express terms specifying that claims under blanket coverage are limited to the amount identified for replacement costs on the statement of values. It concludes that there was a clear and unambiguous inclusion of the entire junior high school under the blanket coverage because any property described on a policy's statement of values would be included under the blanket coverage provisions.

In its argument, PANA is engaging in conduct it accuses the district court of doing; going outside the four corners of the policy. Taken substantively, PANA's statement that nothing expressly excluded the building from coverage is correct. However, the insurance policy and bid specifications unambiguously show that the south building was never intended to be included. PANA also ignores two important facts. First, the bid specifications provided that coverage "shall be on a blanket basis with *replacement cost coverage* for buildings, personal property, and property in the open to apply to all locations unless otherwise noted." (Emphasis added). Second, the bid specifications listed each building under the policy with the corresponding replacement cost. These replacement figures ranged from a high school valued at $5,123,472.00 to a tool shed valued at $5,791.00. The north building of the junior high school had a replacement cost of $1,616,031.00 and was listed separately from the south building, which had a replacement cost of "0". Thus, the failure to designate a replacement cost for the south building has spe-

cial import, considering that "coverage shall be on a blanket basis with replacement cost coverage." We fail to see how such coverage can be applied when no replacement cost exists for the south building. We also fail to see how PANA can downplay the significance of the fact that it chose to assign a replacement value solely to the north building while leaving the south building with a zero. It was PANA's responsibility to prepare and submit the statement of values upon which the blanket coverage was based and to establish the replacement cost value for each building. The zero value designated for the south junior high school building was completely PANA's responsibility.

PANA cites *Dash Messenger Service, Inc. v. Hartford Insurance Company*, 582 N.E.2d 1257 (Ill. App. Ct. 1991), as support for its position. *Dash Messenger Service* noted that if an insurer does not intend to insure against a risk likely to be inherent in the insured's business, the insurer should expressly exclude that risk from the coverage of the policy. *Dash Messenger Service, Inc.*, 582 N.E.2d at 1263. This provision of the law, however, focuses on the type of injuries that may be incurred and risks inherent in the insured's business. The issue in cases such as *Dash Messenger Service* and *Bremen State Bank v. Hartford Accidental & Indemnity Co.*, 427 F.2d 425 (7th Cir. 1970), centered on how the loss was actually incurred and whether the type and cause of injury was intended to be covered under the policy. For example, in *Bremen State Bank*, this Court, interpreting Illinois law, reversed a district court's decision in favor of a bond company because it should have specifically excluded inherent risks from the coverage of the policy. However, the question in *Bremen State Bank* was whether "a loss resulting from misplacement of money . . . was contemplated as being covered" by an indemnity bond. *Bremen State Bank*, 427 F.2d at 427. Like *Dash Messenger Service*, *Bremen*

*State Bank* was concerned with how the underlying loss occurred. In this case, the question is not whether the type of harm suffered (fire damage) was meant to be included under the coverage but rather, whether the south building was covered under the policy. Whether the coverage includes certain property, as opposed to whether the coverage includes how the injury was sustained, are two different questions. PANA's reliance on *Dash Messenger Service* is misplaced.

While there was no express exclusion of the south building from coverage, we agree with the district court that the evidence shows there was no express or implied intent to include coverage of the building. In contemplating what the provisions of an insurance agreement may mean, we must consider them in the factual context of the case. *See Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1232 (7th Cir. 1994) (interpreting Illinois law). The bid specifications for 1996 reveal that a tool shed was important enough to be valued for the policy. The zero designated for the south building shows how PANA truly viewed the worth of this condemned storage facility. In addition, PANA requested a quote for Ordinance and Law coverage, which is designed to cover the increased cost of construction imposed by new building codes, for only the north building but not the south building. Indiana also never charged, and PANA never paid, a single premium with respect to the south building. For these reasons, we find that the district court was correct when it determined the south building was never insured under the blanket coverage.

PANA next asserts that Indiana's determination as to the meaning of the "0" on the statement of values had no basis in any insurance manuals, industry practice, or the law. PANA also faults the district court for creating what it calls "a new contractual provision out of whole cloth" when it determined the "0" represented a sublimit to which the blanket replacement cost coverage did not apply.

It claims that Indiana's position and the district court's ruling concerning the meaning of the zero designation were erroneous because they amounted to little more than a subjective interpretation of a potentially ambiguous term.

If the words in an insurance policy are susceptible to more than one reasonable interpretation, they are ambiguous, *United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991), and will be construed against the insurer who drafted the policy, *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992). A provision is ambiguous if it is reasonably susceptible to multiple interpretations. *In re Osborne*, 763 N.E.2d 855, 857 (Ill. App. Ct. 2002). When a policy's words are unambiguous, a court must afford them their plain, ordinary, and popular meaning. *Employers Ins. v. James McHugh Constr. Co.*, 144 F.3d 1097, 1104 (7th Cir. 1998). A court should consider the plain meaning of the policy language and should not search for a nonexistent ambiguity. *Dash Messenger Serv., Inc. v. Hartford Ins. Co.*, 582 N.E.2d 1257, 1260 (Ill. App. Ct. 1991).

PANA makes the argument throughout its briefs that Indiana lacks authority for various propositions it makes. However, not every argument needs case law for support. When there is a dearth of case law on a point, we will often turn to notions of common sense. *See Potratz v. Dep't of Law Enforcement*, 506 N.E.2d 1050, 1051 (Ill. App. Ct. 1987). In our estimation, zero means zero. Considering the facts and circumstances surrounding the contract, designating the replacement cost of something as "0" leads to no other conclusion except that the building is of nominal value. The inherent meaning of the figure "0" on a statement of values is fairly obvious in delineating that item's lack of worth. We can see no other reasonable interpretation of such an unambiguous term. Thus, the district court's straightforward determination

about what an unambiguous figure means does not imply the court read something into the contract, as PANA suggests. To disallow a court to do what the district court did in this case would confound the process of reviewing contract disputes. In fact, PANA's argument is asking us to do something which *Dash Messenger Service* specifically warned against: searching for a nonexistent ambiguity. *See Dash Messenger Serv.*, 582 N.E.2d at 1260. To determine that the figure "0" is ambiguous would be an analytical leap of faith. Because the "0" is unambiguous, we give the figure its ordinary meaning, which means the south building had no replacement cost and thus the building was not part of the blanket coverage. No insurance manual, policy, industry standard, or case law is needed to understand the meaning of "0."

When interpreting an insurance policy, the parties' intent is the most significant factor. *Weeks v. Aetna Ins. Co.*, 501 N.E.2d 349, 352 (Ill. App. Ct. 1986). Intent may be ascertained from the circumstances surrounding the issuance of the policy, including the situation of the parties and the reason the insured obtained the policy. *Dora Township v. Ind. Ins. Co.*, 400 N.E.2d 921, 922 (Ill. 1980). The entire insurance contract, rather than an isolated part, should be read to determine whether an ambiguity exists. *See Cobbins v. Gen. Accident Fire & Life Assurance Corp.*, 290 N.E.2d 873 (Ill. 1972).

Despite the obvious meaning of the figure "0," we also point out that the building in question was condemned fifteen years ago and was used merely for storage. To then claim that this obsolete building was intended to be within the coverage is too big a stretch. Considering the building's decrepit state and the clear indication that Indiana never intended to charge PANA for its coverage, it is evident that the parties did not intend to include the building under the policy. For these reasons, we affirm the

district court's ruling that the zero designation was an unambiguous term which clearly limited the liability of Indiana.

## II. Reformation

PANA finally claims that it was entitled to have the contract reformed because of a mutual mistake by the parties. PANA argues that when it accepted Indiana's bid, there had been a meeting of the minds, but the 1996 policy demonstrates that both parties were mistaken as to coverage issues.

"Reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing." Restatement (Second) of Contracts § 155 cmt. a. The purpose of reformation is "to make a writing express the agreement that the parties intended it should." *Id*. A party can obtain a contract reformation by showing through clear and convincing evidence that: (1) there has been a meeting of the minds resulting in an actual agreement between the parties; (2) the parties agreed to reduce their agreement to writing; and (3) at the time the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other. *Alliance Syndicate v. Parsec, Inc.*, 741 N.E.2d 1039, 1048 (Ill. App. Ct. 2000).

PANA's reformation claim relies heavily on the flawed position that the zero designation for the south building was ambiguous. This takes us full circle; "0" on the statement of values is clear and unambiguous.

Perhaps realizing the obstacles this argument poses, PANA highlights Indiana's insertion of a contractual provision not agreed upon into the policy. It is undisputed

that Indiana added a demolition and debris removal provision that was not included in the 1996 bid specifications.[1] PANA, however, never questioned or objected to Indiana providing demolition and debris removal coverage of $50,000.00. More importantly, we fail to see the significance of Indiana's error in including debris and removal coverage. PANA makes a futile attempt to link the debris coverage with the zero designation for the south building. PANA argues that Indiana added the debris removal provision based on Indiana's own erroneous interpretation of the zero designation. We fail to see any correlation between the zero designation and debris removal provision. The debris removal provision offers no insight or explanation as to why a "0" was assigned to the south building. More importantly, it in no way suggests that the zero designation was the result of some flawed interpretation on Indiana's part.

The parties clearly agreed to how the south building of the junior high school was to be treated under the policy. There was no provision accidently omitted from the policy. Further, Indiana never learned that PANA had changed its position with regard to the south building. Indiana never intended to provide coverage for a building valued at "0." Indiana did not include the south building in its determination of whether to provide coverage or its final bid amount, nor did Indiana ever charge PANA for premiums related to the south building. If any mistake occurred, it was a unilateral mistake by PANA. For these reasons,

---

[1] While Indiana may have erred in its inclusion of the debris removal coverage, PANA does not assert, nor could it successfully, that this alleged mistake warrants reformation. The $50,000.00 of debris removal was never disputed by either party and was promptly paid by Indiana. PANA broaches the issue merely in connection with its argument that Indiana erroneously interpreted the zero designation on the statement of values.

we find the district court was correct in its determination that there was not a mutual mistake.

Accordingly, we AFFIRM the decision of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*