(No. 70298.—

LUKE DeGRAND *et al.*, Appellants, v. MOTORS IN-
SURANCE CORPORATION, Appellee.

*Opinion filed January 23, 1992.—Rehearing
denied March 30, 1992.*

BILANDIC, J., joined by CLARK and FREEMAN, JJ., dissenting.

FREEMAN, J., also dissenting.

Donald C. Clark, Jr., and Luke DeGrand, of Clark & DeGrand, of Chicago, for appellants.

John T. Hickey, Jr., and Ronald S. Betman, of Kirkland & Ellis, of Chicago, for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The United States Court of Appeals for the 7th Circuit, pursuant to Circuit Rule 52 (Fed. R. App. P. 52), certified the following question of Illinois law to this court:

> "Does Illinois law require insurers to offer underinsured motorist coverage (and, if so, in what amount) to automobile purchasers who opt for uninsured motorist coverage at the minimum statutory level?" *DeGrand v. Motors Insurance Corp.* (7th Cir. 1990), 903 F.2d 1100, 1104.

We accept jurisdiction to answer this question pursuant to Supreme Court Rule 20 (134 Ill. 2d R. 20).

On February 8, 1986, Luke DeGrand and Karen Kies DeGrand purchased a 1986 Chevrolet Nova from Ruby Chevrolet in Chicago. They financed the vehicle through General Motors Acceptance Corporation (GMAC), a subsidiary of General Motors, engaged in the business of financing motor vehicles. The DeGrands applied for, and

received, automobile insurance from Motors Insurance Corporation (MIC), a subsidiary of GMAC, engaged in the business of insuring motor-vehicle-related risks. All of this was accomplished before the DeGrands drove their new car from the Ruby Chevrolet lot.

On March 12, 1986, Karen Kies DeGrand was involved in an automobile accident. Karen sustained a severe and permanent ankle injury as a result of the two-car collision. The DeGrands sued the driver of the other car. Unfortunately, that driver carried only minimal bodily injury liability coverage ($50,000), which was insufficient to compensate Karen.

The DeGrands turned to their own automobile insurance policy to determine whether their policy covered excess damages. When they discovered it did not, they sued their insurer, MIC, in State court for reformation of their insurance contract, claiming MIC had violated Illinois law by failing to offer them underinsured motorist coverage in an amount equal to their bodily injury liability coverage.

The DeGrands filed a declaratory judgment action against MIC in the circuit court of Cook County (Ill. Rev. Stat. 1987, ch. 110, par. 2—701). Plaintiffs alleged that MIC failed to offer them an opportunity to purchase *underinsured* motorist coverage up to the limits of their bodily injury liability coverage in violation of section 143a—2 of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1987, ch. 73, par. 755a—2). The DeGrands also requested a judgment reforming their MIC policy to increase their *underinsured* coverage up to their bodily injury liability coverage ($100,000 per person/$300,000 per occurrence).

MIC removed the action to the United States District Court for the Northern District of Illinois based on diversity, pursuant to 28 U.S.C. §1332 (1988). Both the

DeGrands and MIC filed cross-motions for summary judgment.

On June 14, 1989, the district court granted MIC summary judgment on the entire complaint because the policy of insurance was issued after July 1, 1983, and MIC was under no statutory duty to make an offer of underinsured motorist coverage. The DeGrands filed a notice of appeal.

On May 30, 1990, the 7th Circuit rendered its opinion (903 F.2d 1100), certifying to this court the question of law. The 7th Circuit recognized that "[t]he language of the statute does not seem to require insurers to issue or offer *any* underinsurance to drivers who elect minimum uninsured motorist coverage." (Emphasis in original.) (903 F.2d at 1103 n.2.) The 7th Circuit noted that there was a split of authority in the districts of the appellate court of Illinois.

The DeGrand's insurance policy provided bodily injury and property damage coverage of $100,000 per person and $300,000 per occurrence. The policy also provided uninsured motorist coverage of $15,000 per person and $30,000 per occurrence, and although allegedly unknown to the DeGrands, underinsured motorist coverage in the same amount as uninsured. The DeGrands claimed they never knew about the underinsured motorist coverage until after the accident.

The only dispute between the DeGrands and MIC is relative to *underinsured* motorist coverage. There is no question, however, that the DeGrands had sufficient knowledge of their uninsured motorist coverage. Luke DeGrand's signature appears underneath the text referring to an opportunity to purchase coverage up to the bodily injury limits. In a blocked section above the signature block, the word "underinsurance" appears in the MIC printed insurance application which refers to the amount of coverage for uninsured/underinsured liability.

All of the printing on the insurance application is the same size. The application provides, in part:

"I apply for the following liability limits:

Bodily injury and property damages—limit $*100 300,000*

Uninsured/underinsured motorist coverage

_____ A equal to liability limits selected above

__x__ B other (specify) *15/30*.

Limits for uninsured/underinsured motorist coverage may not exceed limits for bodily injury and property damage coverages.

\* \* \*

I acknowledge that I have been provided an opportunity to purchase uninsured motorist coverage up to the limits of my bodily injury limits.

*s/Luke DeGrand"*

(Emphasis added.)

Although the policy application provides coverage for underinsurance in the same amount as uninsured coverage, plaintiffs argue that MIC's failure to offer them underinsurance coverage constitutes a breach of its legal responsibilities under the Code. MIC argues that recent amendments to the Code make such an offer unnecessary because when an individual elects uninsured motorist coverage, the individual automatically receives underinsurance in the equivalent amount, so long as the policy contains such provisions. The policy application in this cause contained such a provision.

The district court, in reiterating MIC's position, stated:

"Because plaintiffs' insurance policy provided uninsured motorist coverage at the minimum limit, MIC was under no statutory duty to make an offer of underinsured motorist coverage. As of July 1, 1983, an insurer's obligation to include—not merely offer—underinsured motorist coverage turns on whether the policy provides for unin-

sured motorist coverage in excess of the statutory minimum. Since plaintiffs' policy was issued after July 1, 1983, and provided uninsured motorist coverage only at the statutory minimum level, their claim against MIC must fail."

In conclusion, the district court held that the Code did not require insurers to offer additional underinsured motorist coverage when individuals elect uninsured motorist coverage at the statutory minimum.

In light of the certified question, this court finds that the focus of this matter is one of statutory interpretation. Since this is a diversity case, such focus is proper. (*Cf. United States v. Thirty-Seven (37) Photographs* (1971), 402 U.S. 363, 369, 28 L. Ed. 2d 822, 829-30, 91 S. Ct. 1400, 1404-05.) Only a State court can authoritatively interpret its own State's statutes and ordinances. *Waldron v. McAtee* (7th Cir. 1983), 723 F.2d 1348, 1352.

It is well established that in construing a statute, the court should give effect to the legislative intent. (*State v. Mikusch* (1990), 138 Ill. 2d 242.)

"In seeking to ascertain legislative intent, courts consider the statutes in their entirety, noting the subject they address and the legislature's apparent objective in enacting them. [Citation.] It is presumed that the legislature, in enacting various statutes, acts rationally and with full knowledge of all previous enactments. [Citation.]" (*Mikusch*, 138 Ill. 2d at 247-48.)

The court stated further:

"Generally, a material change in the language of an unambiguous statute creates a presumption, although it can be rebutted by evidence of a contrary legislative intent, that the amendment was intended to change the law. [Citations.]" 138 Ill. 2d at 252.

Prior to August 16, 1982, section 143a—2 stated, in part:

"(1) *Required offer of additional uninsured motor vehicle coverage.* No policy insuring against loss resulting

from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in State with respect to any motor vehicle registered or principally garaged in this State *unless uninsured motorist coverage as required in Section 143(a) of this Act is offered in an amount up to the insured's bodily injury liability limits.*

\* \* \*

(3) *Required offer of underinsured motorist coverage.* Any offer made under subsection (1) of this Section shall also include an offer of underinsured coverage." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 73, par. 755a—2.

Under the 1981 statutory scheme, the insurer was required to make a meaningful offer of underinsured motorist coverage that could then be accepted or rejected by each insured individual. *Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419, 429.

In 1982, the legislature altered that scheme by amending the 1981 statute in Public Act 82—920, effective August 16, 1982, which provided, in part:

"(1) Required offer of additional uninsured motor vehicle coverage. No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in State with respect to any motor vehicle registered or principally garaged in this State unless uninsured motorist coverage as required in Section 143a of this Act is offered in an amount up to the insured's bodily injury liability limits.

\* \* \*

(3) Required offer of underinsured motorist coverage. *Until July 1, 1983, any offer made under* subsection (1) of this Section *shall also include an offer of underinsured motorist coverage.* \* \* \*

\* \* \*

(5) On or after July 1, 1983, *no policy insuring against loss resulting from liability* imposed by law for

bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle *shall be renewed or delivered or issued* for delivery in this State with respect to any motor vehicle registered or principally garaged in this State *unless underinsured motorist coverage is included* in such policy *in an amount at least equal to the total amount of uninsured motorist coverage provided* in that policy where such uninsured motorist coverage exceeds the limits set forth in Section 7— 203 of the Illinois Vehicle Code." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 73, pars. 755a—2(1), (3), (5).

These 1982 amendments were in effect until the legislature changed that scheme in Public Act 86—1156, section 4, effective August 10, 1990, and Public Act 86— 1155, section 1, effective July 1, 1991 (hereinafter referred to as the 1990 statute). The 1990 statute provides in part, with emphasis added to the new language:

"(1) *Additional uninsured motor vehicle coverage.* No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State with respect to any motor vehicle *designed for use on public highways and required to be registered* in this State unless uninsured motorist coverage as required in Section 143a of this Code is included in an amount *equal* to the insured's bodily injury liability limits *unless specifically rejected by the insured. Each insurance company providing the coverage must provide applicants with a brief description of the coverage and advise them of their right to reject the coverage in excess of the limits set forth in Section 7—203 of The Illinois Vehicle Code. The provisions of this amendatory Act of 1990 apply to policies of insurance applied for after June 30, 1991.*

\*\*\*

(3) *The original application indicating the applicant's selection of uninsured motorist coverage limits shall constitute sufficient evidence of the applicant's selec-*

*tion of uninsured motorist coverage limits and shall be binding on all persons insured under the policy.* \*\*\*

(4) \*\*\*

On or after July 1, 1983, no policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State with respect to any motor vehicle *designed for use on public highways and required to be registered* in this State unless underinsured motorist coverage is included in such policy in an amount *equal* to the total amount of uninsured motorist coverage provided in that policy where such uninsured motorist coverage exceeds the limits set forth in Section 7—203 of the Illinois Vehicle Code." (Emphasis added.) Ill. Rev. Stat., 1990 Supp., ch. 73, pars. 755a—2(1), (3), (4).

We now turn to the interpretation of those amendments. In the 1981 statute, the insurer was required to make a meaningful offer of underinsured motorist coverage that could be accepted or rejected by each insured individual. However, the legislature substantially altered that scheme with the 1982 statute.

The 1982 statute provided that whenever an individual purchased uninsured motorist coverage in an amount greater than the statutory minimum, the insurer must also provide underinsured motorist coverage in the same amount. The 1982 statute also provided that after July 1, 1983, the insurer must provide and the insured must accept the underinsured motorist coverage. The new statute did not permit the insurer or insured to reject this coverage. The 1982 statute provided additional coverage for many individuals purchasing automobile insurance after July 1, 1983. If the insured purchased uninsured motorist coverage in an amount above the statutory minimum, the insured must also purchase underinsured motorist coverage in the same amount.

The 1982 statutory scheme is consistent with the legislature's purpose in enacting the 1981 statute as stated by this court in *Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419:

"[T]he legislature recognized that soaring medical costs often left injured parties only partially compensated for their injuries. The legislature was obviously concerned with adequately compensating injured parties." *Cloninger*, 109 Ill. 2d at 424.

According to the 1982 statutory scheme, an automobile owner who purchases the minimum amount of uninsured motorist coverage after July 1, 1983, was entitled neither to an offer of underinsured motorist coverage nor to automatic inclusion of such coverage in an amount commensurate with uninsured motorist coverage provided the uninsured motorist coverage exceeded the statutory minimum. The policy had to contain underinsured motorist coverage in an amount at least equal to the total amount of uninsured motorist coverage. Only those policies issued prior to July 1, 1983, were entitled to an offer of underinsurance. The legislative history does not shed light on the reasons for the change. Furthermore, we agree with the district court that the parties to this appeal do not offer cogent reasons why the legislature would have adopted this course.

By 1990, the legislature had again changed the statutory scheme. In the amended statute, the legislature deleted the required offer of additional uninsured motor vehicle coverage. (Ill. Rev. Stat., 1990 Supp., ch. 73, par. 755a—2(1).) The 1990 statutory scheme provides that uninsured motor vehicle coverage must be in an amount *equal* to the insured's bodily injury liability; whereas, the 1981 version required only an offer of uninsured motorist coverage in an amount up to the insured's bodily injury liability limits. The 1982 statute provided only for a required offer for policies issued before July 1, 1983. (Ill.

Rev. Stat. 1983, ch. 73, par. 755a—2(3).) The 1982 statutory scheme also provided that the underinsured motorist coverage be in an amount *at least equal* to the total amount of uninsured motorist coverage. Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(5).

The 1990 statute adds a new element to the policies. The new provision provides that the insurer describe the coverage and advise the insured of his or her right to reject the coverage in excess of $20,000 per person/$40,000 per occurrence. (Ill. Rev. Stat., 1990 Supp., ch. 73, par. 755a—2(1).) The statute also provides that the original or a copy of the policy shall constitute sufficient evidence of the insured's selection of uninsured motorist coverage limits. (Ill. Rev. Stat., 1990 Supp., ch. 73, par. 755a—2(3).) The new scheme further provides that the underinsurance motorist coverage be in an amount *equal* to the total of uninsured motorist coverage as long as that coverage exceeds $20,000 per person/$40,000 per occurrence. See Ill. Rev. Stat., 1990 Supp., ch. 73, par. 755a—2(4).

In reading the statute and its amendments, this court finds that when the legislature enacted the change to the 1981 statutory scheme in 1982, the legislature acted rationally with full knowledge of all previous enactments as well as decisions. Furthermore, this court finds that the material change in the 1982 statute created a presumption that the amendment was intended to change the law regarding "required offer." The 1990 statute supports that presumption. We hold that the insurer in this case was not required to make a specific offer of underinsured motorist coverage. We note that the policy did contain the words "underinsured and uninsured" in a section above the section which contained the insured's signature. Although the print is small, the words are nonetheless in the application. This court also notes that the blocked section containing the words "uninsured/

underinsured" motorist coverage reveals that the minimum statutory coverage was specifically chosen because the box for "other" type coverage is marked with an X and the amount chosen, 15/30, is handwritten.

Plaintiffs argue that the policy behind the statute is that consumers must be made aware of this important type of coverage. In their argument, they state that the meaningful offer has been relocated. However, our reading of the statute and its subsequent amendments does not permit this interpretation. The 1990 statute provides proof that the insured must be made aware of the coverage but the "meaningful offer" requirement has intentionally been removed. The 1990 statute significantly coincides with the legislative scheme to protect the insured/consumer by making uninsured and underinsured motorist coverage equal and mandatory. We cannot find where the meaningful offer requirement has been "relocated."

Plaintiffs cite *Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419, for support of their argument that the amount of coverage for underinsured motorist coverage should equal the insured's bodily injury liability limits. However, we find *Cloninger* distinguishable.

In *Cloninger*, the policy was issued prior to the 1982 statute and as such the governing statute was the 1981 version. More importantly, the issue before the *Cloninger* court was not whether an offer must be made but rather whether an offer was made and whether that offer was made in a commercially reasonable manner. The *Cloninger* court found:

> "The legislature not only required that underinsured-motorist coverage be offered but also provided that the insured had a right to elect or reject such coverage. [Citation.] The right to elect or reject such coverage requires that the insured have information regarding the

coverage. [Citation.] Therefore, we believe that the legislature intended that the 'offer' mandated in section 143a—2(3) provide the insured with enough information regarding underinsured-motorist coverage to allow the insured to make an intelligent decision of whether such coverage should be elected or rejected. Such an intelligent decision cannot be made unless an explanation of the coverage is supplied. [Citation.]" *Cloninger*, 109 Ill. 2d at 424-25.

When this court held in *Cloninger* that the insurer must explain the coverage, we adopted the four-point test for commercial reasonableness of an offer established by the Minnesota Supreme Court in *Hastings v. United Pacific Insurance Co.* (Minn. 1982), 318 N.W.2d 849. Although the holding in *Cloninger* dealt with the 1981 version of the statute, part of that holding is still viable, but not the meaningful offer test. The 1990 statute provides an explanation of coverage by the insurer as follows:

"Each insurance company providing the coverage must provide applicants with a brief description of the coverage and advise them of their right to reject the coverage in excess of the limits set forth in Section 7—203 of The Illinois Vehicle Code." Ill. Rev. Stat., 1990 Supp., ch. 73, par. 755a—2(1).

We note that since *Cloninger*, the legislature has avoided the use of the term "required offer" in the statute. In fact, we find that the 1990 statute places the burden on the insured to reject and subsequently to reduce the uninsured motorist coverage which is automatically set at an amount equal to the bodily injury liability. No longer is the insurer responsible to make an offer, but rather it is the insured's duty to reduce the uninsured motorist coverage. Furthermore, whatever uninsured motorist coverage the insured elects, underinsured motorist coverage will be set, mandatorily, at the uninsured motorist coverage level. At that point, it is the duty of

the insurer to *explain* the coverage and nothing more. The 1990 statute eliminated the need for the *Hastings* four-point test for determining whether the offer was made in a commercially reasonable manner, as adopted in *Cloninger*.

The dissent asserts that the opinion of this court did not adequately address the certified question and that this court did not accurately interpret the statutory intent. We do not agree. This court notes that, first, the parties failed to provide adequate reasons for their interpretation of the statute and second, we, like the Federal court, did not find that the legislative history, *i.e.*, hearings and debate, did not provide any assistance. Therefore, this court reviewed the next best source of information. This court took into account all of the numerous and drastic statutory changes which took place over a very short period of time. Those changes provide the best source of information and evidence regarding statutory intent. It is from that entire history that we reached the result in this opinion.

We did not focus on one senator's remarks or one statutory change but a series of drastic changes to one section of the Insurance Code over a short period of time. It is through those observations that this court concluded that the meaningful offer test is not applicable.

Furthermore, this court reviewed those changes to the statute in light of the entire insurance application at issue. We did not focus on only one section of the application. The dissent, however, focuses on the fact that the car salesperson filled out the application and as such asserts that the majority has failed to protect the consumer by finding that the meaningful offer test is not applicable. However, this court finds otherwise. This court recognizes that the consumer in this instance unfortunately may have been placed at a disadvantage;

nevertheless, it does not circumvent our duty to interpret the statute as reflected in the statutory changes. Thus, this court cannot increase the protection of a statute without more evidence of such intent. Furthermore, this court notes that the legislature had taken notice of the unfortunate situation and incorporated changes to the statute to reflect those concerns. Consequently, the legislature enacted the present statute.

Thus, we find that the 1982 statute did not require insurers to offer underinsured motorist coverage to automobile purchasers who opted for uninsured motorist coverage at the minimum statutory level.

*Certified question answered.*

JUSTICE BILANDIC, dissenting:

The United States Court of Appeals for the 7th Circuit (7th circuit court) certified the following question of Illinois law to this court:

"Does Illinois law require insurers to offer underinsured motorist coverage (and, if so, in what amount) to automobile purchasers who opt for uninsured motorist coverage at the minimum statutory level?" (Fed. R. App. P. 52.)

The majority's decision to answer this certified question in the negative completely undermines the legislative intent in enacting section 143a—2 of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1983, ch. 73, par. 755a—2). For this reason, I respectfully dissent.

I.

The Certified Question

To bolster its interpretation of the 1982 version of section 143a—2 (amended section 143a—2), the majority erroneously asserts that:

"The 7th Circuit *recognized* that '[t]he language of the statute does not seem to require insurers to issue or offer

any [emphasis omitted] underinsurance to drivers who elect minimum uninsured motorist coverage.' *** (903 F.2d at 1103 n.2.)" (Emphasis added.) (146 Ill. 2d at 524.)

In fact, this statement appears in a footnote to the 7th circuit court's opinion which discusses another Illinois case, *Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243. The 7th circuit court noted that "*Glazewski*, however, does not directly resolve our question." (*De-Grand v. Motors Insurance Corp.* (1990), 903 F.2d at 1102 n.2.) Far from recognizing that the majority's interpretation of amended section 143a—2 is proper, the 7th circuit court stated:

"We cannot discern any reason why Illinois lawmakers left this apparent window of underinsured motorist non-coverage for owners of automobiles who have the least amount of uninsured motorist coverage.

\* \* \*

We are left, then, with a number of plausible (yet, in many ways, contradictory) interpretations of the same statute from Illinois appellate courts without a controlling precedent from the state supreme court. Our lack of guidance is exacerbated by the fact that we can discern no policy reasons for the passage of a statute that, despite being enacted to increase motorist awareness of underinsurance, may undermine that goal by arguably removing the meaningful offer requirement." *DeGrand*, 903 F.2d at 1102-04.

Clearly, the 7th circuit court recognized the consumer protection aspects of the statute and the "meaningful offer" requirement. However, it deferred final judgment to this court, because of the need to determine the intent of the Illinois legislature in the enactment of the statute. The proper focus in this case must be on the legislative intent behind the enactment of and subsequent amendments to section 143a—2 of the Code.

Justice Clark, writing for the majority in *Cloninger v. National General Insurance Co.* (1985), 109 Ill. 2d 419, recognized that:

> " '[T]he primary purpose of statutory construction is to ascertain the legislature's intention, not only from the language which it has used, but also from the reason and necessity for the act, the evils sought to be remedied, and the objects and purposes sought to be obtained.' " (*Cloninger*, 109 Ill. 2d at 425, quoting *Lincoln National Life Insurance Co. v. McCarthy* (1957), 10 Ill. 2d 489, 494.)

Obviously, the legislature intended section 143a—2 to protect the general public in their auto insurance purchases. Simply stated, this is consumer protection legislation. Referring to the 1981 version of section 143a—2 of the Code, Justice Clark wrote:

> "[T]he legislature recognized that soaring medical costs often left injured parties only partially compensated for their injuries. The legislature was obviously concerned with adequately compensating injured parties. As stated by Representative Epton during a House debate on what would later be codified as section 143a—2(3): '[T]his Bill is in behalf of the consumer.' " *Cloninger*, 109 Ill. 2d at 424, quoting 81st Ill. Gen. Assem., House Proceedings, June 20, 1980, at 48.

In *Cloninger*, this court held that the 1981 version of section 143a—2 mandated, *inter alia*, that the insurer provide the insured with a "meaningful offer" of both uninsured motorist coverage and underinsured motorist coverage. (*Cloninger*, 109 Ill. 2d at 425.) We adopted the following four-part test to determine whether a proper offer was made:

> "(1) notification must be commercially reasonable if the offer is made in other than face-to-face negotiations; (2) the limits of the optional coverage must be specified and not set forth in general terms; (3) the insured must be intelligibly advised by the insurer of the nature of the op-

tion; and (4) the insurer must advise the insured that the optional coverage is available for relatively modest premium increases." (*Cloninger*, 109 Ill. 2d at 425-26.)

Under the 1981 version of section 143a—2, the consumer was entitled to make an informed, intelligent decision regarding both uninsured and underinsured motorist coverage. *Cloninger*, 109 Ill. 2d at 425.

The amendments at issue were added to the 1981 version of section 143a—2 and incorporated into the 1982 Code. The 1982 Code provided, in part:

"§143a—2. (1) Required offer of additional uninsured motor vehicle coverage. No policy *** shall be renewed or delivered or issued for delivery in State *** unless uninsured motorist coverage *** is offered in an amount up to the insured's bodily injury liability limits.
        ***

(3) Required offer of underinsured motorist coverage. Until July 1, 1983, any offer made under subsection (1) of this Section shall also include an offer of underinsured motorist coverage. ***
        ***

(5) On or after July 1, 1983, no policy *** shall be renewed or delivered or issued for delivery in this State *** unless underinsured motorist coverage is included in such policy in an amount *at least* equal to the total amount of uninsured motorist coverage provided in that policy where such uninsured motorist coverage exceeds the limits set forth in Section 7—203 of the Illinois Vehicle Code." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 73, pars. 755a—2(1), (3), (5).)

The legislative intent in enacting the 1981 version of section 143a—2 was clearly to fully inform consumers of both uninsured motorist coverage and underinsured motorist coverage. The legislative history of the 1982 amendment at issue *unequivocally* demonstrates that the legislature intended to provide *additional* protection to the consumer. In the words of Senator D'Arco, a sponsor of the amendment:

"Part of the problem is people are not aware that there is underinsurance [coverage] *** and this obviously is going to make them aware of it ***." 82d Ill. Gen. Assem., Senate Proceedings, June 22, 1982, at 4 (statement of Senator D'Arco).

In spite of this clear and unambiguous assertion of legislative intent, the majority has decided that:

"[A]n automobile owner who purchases the minimum amount of uninsured motorist coverage after July 1, 1983, was entitled neither to an offer of underinsured motorist coverage nor to automatic inclusion of such coverage in an amount commensurate with uninsured motorist coverage ***. *** Only those policies issued prior to July 1, 1983, were entitled to an offer of underinsurance." (146 Ill. 2d at 530.)

The majority's holding defies logic and completely undermines the intent of the legislature and the purpose of these consumer protection provisions of the Code.

In construing this statute, it is the duty of this court to view the Code in its entirety, to give effect to the language used, and above all, to give effect to the legislature's intended purpose. This the majority has failed to do. In the first instance, the majority has failed in interpreting the language of the amendment itself. The majority writes:

"The 1982 statute provided that whenever an individual purchased uninsured motorist coverage in an amount greater than the statutory minimum, the insurer must also provide underinsured motorist coverage *in the same amount*. *** [T]he insured must *** purchase underinsured motorist coverage *in the same amount*." (Emphasis added.) (146 Ill. 2d at 529.)

This construction of the 1982 version of section 143a—2 contains a glaring omission: the majority has failed to give effect to two significant words contained in the amendment. The statute provides that, where the consumer has selected uninsured motorist coverage in ex-

cess of the statutory minimum, the policy must include underinsured motorist coverage "in an amount *at least* equal to" the uninsured motorist coverage limits. (Emphasis added.) Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(5).

The language of the amendment itself makes it clear that amended section 143a—2 does not simply require an automatic inclusion of underinsured motorist coverage in the same amount as the selected uninsured motorist coverage limits. The words "at least" establish a minimum amount of underinsured coverage that must be included in the policy if the consumer elects uninsured coverage above the statutory minimum. The consumer, however, may purchase and the insurer may provide underinsured coverage in an amount *greater than* the uninsured coverage limits. But, to do so, the consumer must be *aware* of this type of insurance and the fact that he may purchase *more* underinsurance coverage than that which is automatically included in the policy. The majority's construction of amended section 143a—2, however, eliminates the pre-1982 "meaningful offer" requirement from the statutory scheme. In light of Senator D'Arco's observation that "the problem is people are not aware that there is underinsurance [coverage]," it is difficult to comprehend how the legislative purpose will be served under the majority's construction of amended section 143a—2. The statutory language makes no sense unless the pre-1982 "meaningful offer" requirement is still viable.

Nor do the evils of the majority's decision end here. The majority has failed in its duty to view the Code in its entirety and give effect to its purpose of protecting consumers. The majority decision has left a gaping hole in underinsured motorist coverage with respect to consumers who elect uninsured coverage at the minimum statutory level. Incredibly, the majority holds that this particular class of unwitting consumers are not even en-

titled to be made aware of the nature and availability of underinsured motorist coverage simply because they purchased the minimum uninsured motorist coverage. This class of consumers are put in great peril and will be completely unaware of the fact that they are unprotected when they could have been protected if a "meaningful offer" was made by the insurer. It is obvious that this result flies in the face of the intent of the legislature.

In order to give effect to the legislative purpose, amended section 143a—2 must be viewed in its entirety. This section first requires insurers to make a "meaningful offer" of uninsured motorist coverage up to the consumer's bodily liability limits. (Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(1).) Until July 1, 1983, any offer of uninsured motorist coverage must be accompanied by an offer of underinsured motorist coverage. (Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(3).) On or after July 1, 1983, if the consumer purchases uninsured coverage which exceeds the statutory minimum, underinsured coverage *at least* equal to the chosen uninsured coverage limits must be automatically included in the policy. Ill. Rev. Stat. 1983, ch. 73, par. 755a—2(5).

The majority utilizes the following rules of statutory construction to arrive at its interpretation of amended section 143a—2:

> " 'In seeking to ascertain legislative intent, courts consider the statutes in their entirety, noting the subject they address and the legislature's apparent objective in enacting them. [Citation.] It is presumed that the legislature, in enacting various statutes, acts rationally and with full knowledge of all previous enactments. [Citation.]' " (146 Ill. 2d at 526, quoting *State v. Mikusch* (1990), 138 Ill. 2d 242, 247-48.)

And:

" 'Generally, a material change in the language of an unambiguous statute creates a presumption *** that the amendment was intended to change the law.' " (146 Ill. 2d at 526, quoting *Mikusch*, 138 Ill. 2d at 252.)

Clearly, the legislature did intend to change the law, but not in the way that the majority has concluded. The amendment, section 143a—2(5) of the Code, applies only to a limited class of consumers, *i.e.*, those who purchase uninsured motorist coverage above the statutory minimum. It is only rational for the legislature to have limited the application of this provision to this class of consumers.

At the time of the amendment's enactment, Illinois' financial responsibility law imposed mandatory insurance coverage on Illinois drivers in the amount of $15,000 per person and $30,000 per occurrence (15/30). (Ill. Rev. Stat. 1983, ch. 95½, par. 7—203.) Uninsured motorist coverage protects the insured from the possibility that the at-fault driver has failed to insure himself as required by law.

Often, the at-fault driver's insurance coverage is not enough to compensate the injured party. For these reasons, the injured party's underinsured motorist coverage is the crucial coverage because it will provide, up to its limits, the excess compensation needed by the victim. If the amendment applied to consumers who purchased the statutory minimum uninsured coverage (15/30), it would require the insurer to automatically include (and the consumer to pay for) underinsured coverage of at least the same limit (15/30). However, this underinsured motorist coverage would be "virtually worthless" (see *Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 248-49), because the at-fault driver presumably already has at least that much bodily liability coverage. Under these circumstances, the underinsured motorist coverage would never kick in. Therefore, consistent with rationality, the

legislature limited the application of this amendment to the class of consumers who purchase uninsured coverage above the 15/30 limit.

This provision, however, was never intended to eliminate the statutory protection already afforded to those consumers who choose uninsured motorist coverage at the statutory minimum level. The legislative history makes this crystal clear. Armed with its knowledge that its previous enactments already required insurers to inform consumers about the nature and availability of underinsured motorist coverage, the legislature obviously intended the amendment to provide *additional* protection to consumers rather than to eliminate *any* protection for an entire consumer class. In light of both the legislative history and the language of the amendment itself, it is apparent that the 1982 amendment must be read in conjunction with the pre-1982 "meaningful offer" requirement as additional protection to consumers. To hold otherwise is to encourage consumer deception rather than consumer protection practices.

## II.

### The DeGrands

The facts in this case highlight the tragedy of the majority's holding. Briefly, General Motors Corporation is a manufacturer of motor vehicles. GMAC, a subsidiary of General Motors, is engaged in the business of financing motor vehicles. Motors Insurance Corporation (MIC), a subsidiary of GMAC, is an insurance company engaged in the business of insuring motor-vehicle-related risks.

Ruby Chevrolet is an authorized dealer of General Motors vehicles. It has a showroom and office in Chicago, Illinois. At the same location, Ruby operates as an agent for GMAC to provide financing of motor vehicles. As a condition of financing, consumers are required to

obtain auto insurance coverage. Ruby also operates, from the same location, as an insurance agency for MIC. This provides consumers with a one-stop facility at which they can purchase, finance, and insure motor vehicles.

On February 8, 1986, the DeGrands completed a series of related transactions on the premises of Ruby Chevrolet in Chicago. This resulted in the purchase of a car from Ruby, financed by GMAC, and insured by MIC. The effective date of the policy was February 8, 1986, and provided bodily injury liability coverage of $100,000 per person and $300,000 per occurrence. The policy also included a combination of uninsured/underinsured motorist coverage of $15,000 per person and $30,000 per occurrence. Thus, in order to obtain financing for their auto purchase through GMAC, the DeGrands unwittingly purchased an automobile insurance policy from defendant MIC which provided them with virtually worthless underinsured motorist coverage.

Upon discovering that their underinsured coverage was worthless, the DeGrands instituted the instant declaratory judgment action. In their depositions, both plaintiffs testified that MIC agent Michael O'Donnell took their order for automobile insurance by asking pertinent questions needed to complete MIC's printed application form. Then he requested Luke DeGrand to sign the application form in two places.

Both plaintiffs also testified that agent O'Donnell never mentioned the phrase "underinsured motorist coverage." As a result, they walked away from the MIC office on February 8, 1986, unaware of even the concept of underinsured motorist coverage, much less its availability to them. MIC, through agent O'Donnell, did not offer to sell plaintiffs underinsured coverage in any amount.

Agent O'Donnell testified in his deposition that he did not recall making a specific offer of underinsured motor-

ist coverage to the plaintiffs. However, he makes such an offer as a matter of course to all applicants. Curiously, agent O'Donnell also testified that he had no reason to advise the applicants to purchase uninsured motorist coverage up to their bodily liability limits because "we weren't there really to sell insurance" and, further, "we essentially only try to move the car out and get the required [minimum] insurance."

It is undisputed that the following text and signature appears in the body of the MIC application form:

> "I acknowledge that I have been provided an opportunity to purchase uninsured motorists coverage up to the limits of my bodily liability limits.
>
> *[Luke DeGrand's signature]*"

Based on this text and signature, plaintiffs concede that defendant MIC offered to sell them uninsured motorist coverage up to the limits of their bodily injury limits of $100,000 per person and $300,000 per occurrence. Based on this clause, plaintiffs also concede that they rejected MIC's offer of additional uninsured coverage.

It is also undisputed that the phrase "underinsured motorist coverage" does not appear in this exculpatory clause of MIC's printed insurance application. The majority, however, finds solace in the fact that the application contained the clause "uninsured/underinsured motorist coverage" and that "the minimum statutory coverage was specifically chosen because the box for 'other' type coverage is marked with an X and the amount chosen, 15/30, is handwritten." (146 Ill. 2d at 531-32.) The majority fails to reveal, however, that it was agent O'Donnell who filled out the insurance application and it is *his handwriting* to which the majority refers. The majority also fails to indicate that agent O'Donnell, with the DeGrands' application in front of *him*, offered them uninsured motorist coverage but never mentioned underinsured motorist coverage to them.

It is difficult to comprehend how an offer of underinsured motorist coverage can be made to the consumer when that phrase is not used in either the face-to-face discussion with the insurance agent or in the printed, standard-form exculpatory clause drafted by the insurer which the consumer is required to sign.

Insurance policies are not considered to be light reading material. "Some cases \*\*\* emphasize the \*\*\* point that the policies are rarely understood by the insured and that under such circumstances he should be protected from his own ignorance \*\*\*." (R. Anderson, Couch on Insurance §15:79 (2d ed. 1984).) Furthermore, in this case, the DeGrands, eager to get their new car off the lot, probably never even saw the "uninsured/underinsured motorist coverage" clause since agent O'Donnell is the one who filled out their insurance application. Illinois law does not allow for such a silent offer of underinsured motorist coverage. As Justice Clark wrote in *Cloninger*:

> "[W]e believe that the legislature intended that the 'offer' mandated in section 143a—2(3) provide the insured with enough information regarding underinsured-motorist coverage to allow the insured to make an intelligent decision of whether such coverage should be elected or rejected. Such an intelligent decision cannot be made unless an explanation of the coverage is supplied. [Citation.]" (*Cloninger*, 109 Ill. 2d at 425.)

Contrary to the majority, I would hold that the facts of this case lead to the conclusion that indeed no "meaningful offer" of underinsured motorist coverage was made by MIC to plaintiffs.

Nor can the exculpatory clause signed by Luke DeGrand constitute a waiver of underinsured motorist coverage. This clause does not contain the phrase "underinsured motorist coverage" or even allude to this type of coverage. DeGrand was asked to expressly admit *only*

that he was offered uninsured motorist coverage. Since the application and policy of insurance are MIC's work product, Illinois law requires that its own words should be construed most strongly against it. (*International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 371.) Therefore, the majority errs in its decision to construe this clause as a waiver of underinsured motorist coverage.

For the foregoing reasons, I respectfully dissent.

JUSTICES CLARK and FREEMAN join in this dissent.

JUSTICE FREEMAN, also dissenting:

While it is true that a statutory amendment creates a presumption that the legislature intended to change the law as it previously existed, I believe that in the present case such presumption is not controlling, having been overcome by more persuasive considerations. *Bruni v. Department of Registration & Education* (1974), 59 Ill. 2d 6, 12.

By enacting section 143a—2, the legislature intended that all classes of automobile owners become aware that there existed underinsured motorist coverage. This consumer awareness, and hence protection, was achieved by requiring that insurers make a meaningful offer of such coverage. It makes little sense that the legislature would eliminate such an encompassing requirement by an amendment which merely mandates the policy inclusion of a minimal level of underinsured motorist coverage for one particular class of insured automobile owners. Furthermore, I am not convinced, as is the majority, that the plain meaning of the 1989 version of the statute necessarily supports the view that no meaningful offer was required under the 1983 version. I therefore agree with and respectfully join the dissent of Justice Bilandic.