# Illinois Official Reports

## Appellate Court

*American Service Insurance Co. v. Iousoupov*, 2014 IL App (1st) 133771

| | |
|---|---|
| Appellate Court Caption | AMERICAN SERVICE INSURANCE COMPANY, Plaintiff-Appellee, v. IOURI IOUSOUPOV, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-3771 |
| Filed | December 12, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a collision involving a taxi driver with liability coverage of $500,000 for a single occurrence and uninsured and underinsured motorist coverage of $20,000 per person/$40,000 per occurrence, the minimum allowed by law, and the other driver had policy limits of $50,000, the claim for underinsured motorist coverage made by the taxi driver with his insurer was properly rejected where the limits of the other driver's liability insurance policy were greater than the limits of the taxi driver's underinsured motorist coverage, the underinsured motorist coverage was not triggered, and the election form used by the taxi driver's insurer in establishing the uninsured and underinsured coverage limits was not ambiguous and the minimum limits were knowingly selected when the policy was issued. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-6557; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Scott A. Blumenshine and Jonathan E. Ilijic, both of Law Offices of Meyer & Blumenshine, of Chicago, for appellant. |
| | Alvin R. Becker and Mark L. Evans, both of Beerman Pritikin Mirabelli & Swerdlove LLP, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion. |

# OPINION

¶ 1    The instant appeal concerns the interpretation of a commercial auto insurance policy issued by plaintiff American Service Insurance Company (ASI) to Car Service Company, Inc. (CSC), a taxi company for which defendant Iouri Iousoupov was a driver. While the insurance policy provided liability coverage in the amount of $500,000 for a single limit per occurrence, the policy only contained coverage for uninsured and underinsured motorists of $20,000 per person/$40,000 per occurrence. While driving a taxi for CSC, defendant was injured in a collision involving what he claimed was an underinsured driver. Defendant made a claim with ASI for underinsured motorist coverage and ASI denied the claim, stating that the limits of the driver's liability insurance policy were greater than the limits of ASI's underinsured motorist coverage and, therefore, the underinsured motorist coverage was not triggered. Defendant filed a demand for arbitration, followed by a complaint in the circuit court of Lake County, and plaintiff filed the instant declaratory judgment action in the circuit court of Cook County. After discovery, ASI filed a motion for summary judgment, arguing that the policy's underinsured motorist coverage limits were valid because CSC had elected to reject higher coverage limits. The trial court granted summary judgment, and defendant appeals. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND
¶ 3    On February 22, 2011, ASI filed a complaint for declaratory judgment, alleging that in 2008, ASI issued a commercial auto insurance policy to CSC, which requested liability coverage in the amount of $500,000 for a single limit per occurrence, and uninsured and underinsured motorist coverage in the amount of $20,000 per person/$40,000 per occurrence, the minimum required under law; CSC rejected uninsured and underinsured motorist coverage in excess of the statutory minimum. The policy was renewed in 2009 with the same coverage limits.

¶ 4    The complaint further alleges that on February 14, 2009, defendant sustained bodily injury after a collision with the driver of an auto insured with the Allstate Insurance Company having

policy limits of $50,000. Defendant made a demand for benefits under the underinsured motorist provision of the ASI policy. ASI denied coverage, and defendant made demand for arbitration before the American Arbitration Association, which ASI claimed had no jurisdiction to determine questions of coverage.[1] Accordingly, ASI sought a declaration that no underinsured motorist coverage was available to defendant for the February 14, 2009, incident.

¶ 5    Attached to the complaint was a copy of the insurance policy, which provided, under the heading "Underinsured Motorist Coverage":

> "Underinsured Motorist Coverage. To pay all sums which an insured or his/her legal representative shall be legally entitled to recover as compensatory damages only and not for any punitive or exemplary damages from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured and caused by an accident arising out of the ownership, maintenance or use of the underinsured motor vehicle ***. To pay under this coverage only after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement."

The same section defined " '[u]nderinsured motor vehicle' " as "a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is less than the limit of liability for this Underinsured Motorist Coverage."

¶ 6    The insurance policy also contained a provision entitled "Uninsured Motorist Bodily Injury Election" (the election form), which provided, in all-capitalized letters:

> "Uninsured Motorist Bodily Injury (UMBI) coverage provides bodily injury protection up to the selected limit if [*sic*] for injuries in an accident caused by another motorist who is not covered by any bodily injury liability insurance policy, or who is insured but such coverage is not adequate to compensate for the injuries sustained. I have been offered uninsured motorist coverage in an amount up to the policy limits for bodily injury coverage. Understanding this offer and the rates shown below, I hereby elect or reject such coverage as indicated and have signed herein."

The provision then listed two options, side by side. On the left side, the option stated "I hereby reject higher UMBI bodily injury limits. I understand I can, at any further date, by, written request increase this coverage." On the right side, the option stated "I hereby elect uninsured limits in the amount of _____ I understand the premium for adding this coverage will be as shown." The form contained a handwritten check mark next to the option rejecting higher limits, followed by a signature and date of December 30, 2008.

¶ 7    Underneath the signature, on the same page, was a section entitled "Named Operator Exclusion" that was not completed, followed by a section entitled "Payment Plan" that was also not completed. The election form does not contain any rates or other information pertaining to uninsured or underinsured coverage.

---

[1]Defendant also filed a complaint in the circuit court of Lake County on February 10, 2011, concerning the denial of coverage.

¶ 8        On March 26, 2013, ASI filed a motion for summary judgment, arguing that because CSC expressly rejected higher uninsured and underinsured coverage limits, no underinsured coverage was available to defendant. ASI argued that the rejection of higher limits through the election form complied with Illinois law and accordingly should be enforced as written. On May 1, 2013, defendant filed a response to ASI's motion for summary judgment, arguing that there were questions of fact as to the validity of the election form and that "a reasonable inference from the undisputed facts is that ASI and its agent presented inaccurate, incomplete, and confusing information that did not sufficiently describe and explain [the] uninsured motorist insurance *** coverage and policy options as required by Illinois law."

¶ 9        Attached to ASI's motion for summary judgment and defendant's response were several transcripts from discovery depositions.

¶ 10       First, Elena Hodjaeva testified that she was the president and sole shareholder of CSC, a privately held corporation which she formed in 2008 as a taxi business, which was dissolved in approximately 2010. CSC began with 1 taxi and grew to own 14 taxis at its peak. Vadym Khodyrev was her manager "and he took care of the business," including hiring drivers and handling accounting matters. Hodjaeva, however, was responsible for obtaining insurance for CSC's taxis. Hodjaeva testified that she had no previous experience in the taxi industry prior to forming CSC and that she had a bachelor's degree in biochemistry and was enrolled in nursing school.

¶ 11       Hodjaeva testified that CSC's drivers were independent contractors who paid weekly for renting CSC's vehicles and for other fees, including insurance. CSC obtained auto insurance through Kropp Insurance (the agency), the insurance agency that provided CSC the ASI policy. The insurance premium each driver paid varied depending on the driver's driving record and the type of insurance. Hodjaeva testified that "each driver had a choice of picking the insurance that he or she wanted," between "liability and full coverage." She instructed Khodyrev "to tell the drivers they have a choice of choosing what coverage they want because they pay for the insurance, not me. It doesn't really matter for me whether they have full coverage or just liability." Hodjaeva explained that CSC would pay the agency or ASI, then would be reimbursed by the drivers for their portion of the insurance premiums.

¶ 12       Hodjaeva testified that she dealt with Teri Kropp at the agency concerning CSC's insurance policy. Hodjaeva identified her signature on a June 18, 2008, "uninsured motorist bodily injury election" form, and testified that she signed the form at Kropp's office. When asked whether her personal auto insurance policy at the time contained uninsured or underinsured motorist coverage, she replied "I think it did" because "I think it's a law, everyone has to have it." Hodjaeva was then questioned about the election form's use of the term "rates shown below":

"Q. Did you see when you were looking through Exhibit 1 [(which contained the election form)] anything that showed rates shown below for uninsured or underinsured motorist coverage?

A. No, I did not, but I remember Teri talking about this.

Q. When you say 'Teri talking about this,' what do you mean by that?

A. She explained the form and what I signed.

Q. Do you remember anything–any words she said?

A. I think the coverage is $20,000 up to 40.

Q. What did she tell you about when it would apply?

A. During the accident or after the accident.

Q. Did she describe what type of accident it would apply to?

A. It was many years ago. Again, it's really hard to say exactly what she said."

Hodjaeva testified that she renewed the policy on December 30, 2008, and identified her signature on the election form of the renewal policy.

¶ 13 On examination from ASI's counsel, Hodjaeva again answered questions about each sentence of the election form:

"Q. At the time you signed the form, did you read that [first] sentence before signing the form?

A. Well, it's a very good question because I don't remember. It was in 2008.

Q. So you don't remember one way or the other if you read this before you signed?

A. But I saw this page before.

Q. You testified that Teri explained something about the insurance–about the form when you signed it; is that correct?

A. Yes, she did.

Q. With respect to this first sentence, did she explain anything about what uninsured motorist bodily injury coverage is?

A. I believe so.

Q. What did she explain to you?

A. I don't remember but I'm pretty sure that she mentioned what it was and how it worked.

Q. Do you remember any specifics of what she mentioned?

A. No. I already said that. No."

Later, Hodjaeva testified:

"Q. Is it true that you had been offered uninsured motorist coverage in an amount up to policy limits for bodily injury at that time?

A. Yes.

Q. Can you explain how that offer was made?

A. She explained that if I want or the–if the driver wanted, the driver could insure himself or herself more than is provided by the state.

Q. You're referring to the uninsured motorist coverage; is that correct?

A. Yes.

Q. That was explained to you by Teri at the time you signed this?

A. Yes."

Finally, concerning the last sentence of the election form, Hodjaeva testified:

"Q. The last sentence beginning with I hereby elect, can you read that for me?

A. I hereby elect or reject such coverage as indicated and have signed herein.

Q. Is that a true statement with regard to what you elected that day or which coverage you chose?

A. Yes.

- 5 -

Q. So you chose–And if you look below, there's a checkmark next to–

A. Yes, I chose to reject higher.

Q. Did you place that checkmark in that box?

A. I don't remember.

Q. But you–

A. I mean, I was present, I signed. We're getting really, really technical whether I checked it or not. I don't remember. It was in 2008.

* * *

Q. Did you understand at the time you signed this that you were rejecting the higher level that had been explained to you in electing to take the lower coverage?

A. Yes.

* * *

Yes. Yes, she explained it to me that I had a choice of choosing.

Q. And you chose the–

A. I chose to reject. But each driver had a choice as well."

¶ 14    Hodjaeva testified that she "did understand the coverage options" and made the choice to reject higher coverage "[b]ased on my understanding [of the options] and based on Teri's explanation." She testified that she rejected the higher limit because "[t]he driver didn't want to pay more." She testified that two drivers once elected higher coverage, but canceled it after two weeks; other than those two drivers, none of the other drivers ever elected the higher coverage amount.

¶ 15    Next, Terese Kropp testified that she had been retired for approximately a year and a half, but had been involved in the insurance business for over 40 years, including founding the Kropp Insurance Agency with her husband. Kropp testified that the agency's primary focus was insurance policies for taxi and livery companies.

¶ 16    Kropp testified that she was familiar with uninsured and underinsured motorist coverage and that the insurance companies "gave us the policies, the amounts, the limits. And that's how we wrote it. *** And we explained that all at the time to the insured." Kropp explained the process of dealing with a new applicant:

"Well, they would come in. They knew we wrote it. And I would tell them what the limits were and the companies we had that wrote it. And it went from there. They would tell us. I told them how much. Then they would give us the down payment. We would do the application. They would sign it. And we would get them ready to go down to the Secretary of State to get their plates and sticker."

Kropp testified that "[c]ab companies never wanted to pay more, so you gave them the minimum rates," and "that's what they would pay."

¶ 17    Kropp was questioned as to her understanding of underinsured motorist coverage:

"Q. Can you explain what uninsured motorist coverage covers?

A. I'm sure you have it too.

Q. That may be the case. I'm just asking you for your testimony.

A. It covers you for liability and each accident.

Q. Liability in what circumstances?

A. Well, 20/40. That's all it is. I don't remember that so much anymore.

Q. But do you remember what–liability for what type of occurrence or what kind of liability?

A. If you were injured in the accident, the uninsured motorist, if the other party has no insurance, yours would cover so much.

Q. And the underinsured motorist coverage, can you explain what that is?

A. The same.

Q. That's the same as the uninsured motorist coverage?

A. The other party has no insurance, you're only covered under 20/40.

Q. That's for the uninsured motorist coverage?

A. Yes.

Q. And underinsured motorist coverage?

A. The same.

Q. That's the same. Is there a coverage offered if the other driver in the accident has insurance but not insurance at the level of the–

A. I don't understand.

Q. Okay.

\* \* \*

A. It's been so long. I don't remember."

¶ 18 Next, Bruce Giles testified that he was vice president of product development and underwriting at ASI. Giles testified that if CSC had increased the uninsured and underinsured coverage limits to an amount equal to the $500,000 liability coverage, it would have resulted in a $600 increase in the insurance premium per vehicle.

¶ 19 Giles testified that the election form signed by CSC was the form ASI required insurance agents to use at the time. ASI no longer used the form "[b]ecause I got tired of paying lawyers to sit through depositions in defense of this form and decided that using the standard form would help me reduce my costs."

¶ 20 Giles was asked about the obligations of the insurance agent with respect to underinsured motorist coverage:

"Q. [D]o you know what the obligations are of the insured regarding the offer of this type of coverage–I'm sorry, of the agency with regards to this type of coverage to the insured?

A. The obligation is to explain the coverage to the insured and then have the insured make a selection.

Q. And do you know by looking at this document whether or not that coverage was explained to the insured?

A. I think it was by the fact that there's an X before the signature, which would indicate to me that the agent was sitting with the insured and marked where they needed to sign after reading it, et cetera."

Giles was also asked about the reference to "rates shown below" on the election form:

"Q. The reference to the rates shown below, do you know what that is referring to?

A. Yes, I do.

Q. And what is that referring to?

A. That's referring to if the insured selected a coverage higher than the minimum coverage, the requirement is that the rate to do so must be disclosed to the insured. If they have elected to do so, then that would have been filled in on the right-hand side of the page along with the limit that they were selecting.

Q. And when you say it would have been filled in on the right-hand side of the page, by 'it,' are you referring to the rate–the term rates shown below?

A. I'm referring to if you look on the right-hand side, there's another section. It says: I hereby elect uninsured limits in the amount of–and there's a blank that can be filled in for any amount up to the limits of liability on the policy. I understand the premium for adding this coverage would be as shown.

Q. Is it fair to say that the agent would then hand write in what that rate would be?

A. Yes, sir."

¶ 21 Giles testified that ASI currently had 976 policies on other taxicab companies. None of them had selected uninsured and underinsured motorist coverage at the higher bodily liability limits. Green testified that the reason for this was that taxi companies "never want to pay a dollar more than they absolutely have to. They're some of the cheapest insureds you will see in this industry."

¶ 22 Giles also testified as to ASI's policies concerning uninsured and underinsured coverage:

"Q. The procedure when a customer sits down with a broker and applies for a policy, and specifically for a commercial auto customer, is it fair to say that as a default, they will be offered UM and UIM limits equal to the bodily injury limits, unless they elect the lower coverage option; or is it the other way around, they would be offered the lower limits unless they ask for the higher limits?

A. Unless we get a form designating either a rejection or a lower limit, the policy will be issued at a limit equal to the liability limit until such time as we would get a form.

Q. So your testimony is if you do not receive a form indicating one way or the other which level of limit the customer wants, the customer will then receive the higher limit?

A. Will receive limits equal to their limits of liability.

Q. And when you're saying limits, you're referring to both the UM and UIM?

A. Correct.

Q. And has that ever happened in your practice where a customer has failed to submit the form?

A. Many times.

Q. What do you do in that event?

A. We issue the policy with limits equal to the limits of liability on the policy and we bill them for the additional premium if it wasn't included in their down payment, et cetera.

Q. Has that ever happened with any of your taxi company clients?

A. Yes, it has.

Q. And what is their response when you bill them for the higher premium?

A. They rather quickly get a form in rejecting the coverage."

¶ 23 Next, Paul Pitalis testified that he was a consultant with several insurance companies and worked at ASI at the time of the CSC policy. Pitalis created the election form at issue in the case at bar, which originally included space to include potential premium charges for higher limits of liability. However, Pitalis testified that the inclusion of this information would "not really" assist an insured in evaluating the uninsured motorist coverage options "[b]ecause when they're conducting the application process at the producer's office, he has to show them both the rates for all of the coverage," due either to "ethics" or "the fact that [the customer is] shopping" and would therefore be looking for competitive pricing. Pitalis testified that insureds "have no concept what these terms mean. They have to be told. That's why the law requires the producer to tell them what it's all about."

¶ 24 Finally, defendant's response included an "affidavit"[2] of James Leatzow, an expert in the insurance industry who reviewed the election form and determined that the form "does not briefly describe or clearly explain uninsured or underinsured motorist coverage to their insureds. That renders the form inadequate, confusing, incomplete and therefore ambiguous to the detriment of their insureds."

¶ 25 On May 21, 2013, ASI filed a reply in which it asked the trial court to strike Giles' discussion of ASI no longer using the election form, the affidavit of Leatzow, and the portions of Pitalis's deposition relating to his understanding of an insurer's obligations under Illinois law.

¶ 26 On October 28, 2013, the trial court issued a written memorandum opinion and order granting ASI's motion for summary judgment. First, the court considered ASI's requests to strike. The court concluded that both Leatzow's affidavit and Pitalis' testimony contained "a statutory interpretation of Section 143a-2, and [were] not proper," and so struck them. Next, the court agreed with ASI that Giles' testimony that the election form was no longer used by ASI "implicate[d] the prohibition against the use of post-remedial measures" and so struck that portion of Giles' testimony.

¶ 27 Turning to the merits of the motion, the court found that the election form was not ambiguous, noting that "[t]he fact that the form is not the paradigm of clarity does not render it ambiguous. The Court does not find that the words used in the insurance policy are reasonably susceptible to more than one meaning." Additionally, the court found that there was no evidence that ASI failed to provide CSC a brief explanation of the underinsured motorist coverage options and, instead, the evidence was to the contrary. Furthermore, the court found that such an explanation was unnecessary under the Illinois Insurance Code (the Insurance Code) (215 ILCS 5/1 et seq. (West 2008)), noting:

> "The Court finds the Election Form valid pursuant to Section 143a-2 of the Insurance Code and that it provides a 'brief description' of uninsured motorist coverage as required by Section 143a-2. While Iousoupov urges an interpretation of Section 143a-2 that might result in a more meaningful understanding of the Election Form, this reading is not found in the plain text of the statute. If the legislature intended the 'brief description' to be in person, it would have written the statute to incorporate that requirement. A court, in interpreting a statute, is not allowed to add words or

---

[2]While neither the parties nor the trial court mentions it, the document in the record is not signed and is not notarized, despite there being spaces for both on the document.

meanings in the statute which the legislature plainly omitted. The Court finds this sufficient and therefore enforceable."

Finally, the court concluded that since the other driver had liability limits of $50,000 under his insurance policy, which was higher than the coverage limits on the ASI policy, underinsured motorist coverage was not triggered and ASI had no obligation to pay defendant's underinsured motorist claim. The court accordingly granted ASI's motion for summary judgment and dismissed the case in its entirety. This appeal follows.

ANALYSIS

On appeal, defendant argues that the trial court erred in granting ASI's motion for summary judgment because the election form is ambiguous and there is a question of fact as to whether the execution of the election form complied with the requirements of the Insurance Code. Defendant also claims that the trial court erred in striking portions of Giles' and Pitalis's depositions and Leatzow's affidavit.

A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). " 'The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.' " *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

"Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

" 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 33    In the case at bar, defendant argues that ASI failed to comply with the Insurance Code by insufficiently describing and explaining its underinsured motorist coverage. Under the Insurance Code, the limits of underinsured motorist coverage are automatically set at a level equal to the limits of the insured's uninsured motorist coverage when the uninsured motorist coverage exceeds the statutory minimum. 215 ILCS 5/143a-2(4) (West 2008); *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 45 (2003). Furthermore, under section 143a-2(1) of the Insurance Code:

> "No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be renewed or delivered or issued for delivery in this State with respect to any motor vehicle designed for use on public highways and required to be registered in this State unless uninsured motorist coverage as required in Section 143a of this Code is included in an amount equal to the insured's bodily injury liability limits unless specifically rejected by the insured as provided in paragraph (2) of this Section. Each insurance company providing the coverage must provide applicants with a brief description of the coverage and advise them of their right to reject the coverage in excess of the limits set forth in Section 7-203 of [t]he Illinois Vehicle Code [(625 ILCS 5/7-203 (West 2008))]." 215 ILCS 5/143a-2(1) (West 2008).

Thus, unless specifically rejected by the insured, the limits of uninsured motorist coverage and, by extension, underinsured motorist coverage, are equal to the limits of the insured's bodily injury liability limits. The Insurance Code permits "[a]ny named insured or applicant" to reject uninsured motorist coverage in excess of the statutory limits by making a written rejection of limits in excess of those required by law, and such election "shall be binding on all persons insured under the policy." 215 ILCS 5/143a-2(2) (West 2008). The original document indicating the insured's selection of uninsured motorist coverage limits or a copy thereof "shall constitute sufficient evidence of the applicant's selection of uninsured motorist coverage limits." 215 ILCS 5/143a-2(3) (West 2008).

¶ 34    In the case at bar, as noted, the election form included in ASI's policy was entitled "Uninsured Motorist Bodily Injury Election" and provided, in all-capitalized letters:

> "Uninsured Motorist Bodily Injury (UMBI) coverage provides bodily injury protection up to the selected limit if [*sic*] for injuries in an accident caused by another motorist who is not covered by any bodily injury liability insurance policy, or who is insured but such coverage is not adequate to compensate for the injuries sustained. I have been offered uninsured motorist coverage in an amount up to the policy limits for bodily injury coverage. Understanding this offer and the rates shown below, I hereby elect or reject such coverage as indicated and have signed herein."

The form then listed two options, side by side. On the left side, the option stated "I hereby reject higher UMBI bodily injury limits. I understand I can, at any further date, by, written request increase this coverage." On the right side, the option stated "I hereby elect uninsured limits in the amount of _____ I understand the premium for adding this coverage will be as shown." The form contained a handwritten checkmark next to the option rejecting higher limits, followed by a signature and date of December 30, 2008. In her deposition, Hodjaeva testified that the signature on the election form was hers. This, under the Insurance Code, is sufficient evidence that CSC's insurance policy with ASI contained only the minimum uninsured and underinsured motorist coverage limits. See 215 ILCS 5/143a-2(3) (West 2008).

¶ 35    However, defendant claims that the election form used by ASI and signed by Hodjaeva is ambiguous and inaccurate and does not constitute a brief description of the coverage as required by the Insurance Code. Thus, since the form did not comply with the requirements of the Insurance Code, defendant argues that we should impose limits equal to the $500,000 bodily injury liability limits. We do not find this argument persuasive.

¶ 36    As noted, the Insurance Code requires that "[e]ach insurance company providing the [uninsured motorist] coverage must provide applicants with a brief description of the coverage and advise them of their right to reject the coverage in excess of the limits set forth in Section 7-203 of [t]he Illinois Vehicle Code." 215 ILCS 5/143a-2(1) (West 2008). Our supreme court has stated that the burden is on the insured to reject higher uninsured motorist coverage and the insurer does not have the responsibility of making an offer of higher limits, as was the case with earlier versions of the Insurance Code. *DeGrand v. Motors Insurance Corp.*, 146 Ill. 2d 521, 533 (1992). Additionally, "whatever uninsured motorist coverage the insured elects, underinsured motorist coverage will be set, mandatorily, at the uninsured motorist coverage level. At that point, it is the duty of the insurer to explain the coverage and nothing more." (Emphasis omitted.) *DeGrand*, 146 Ill. 2d at 533-34. In the case at bar, we agree with the trial court that ASI's election form provided CSC with a brief description of uninsured and underinsured motorist coverage and advised of the right to reject coverage in excess of the statutory limits. Furthermore, the testimony of Hodjaeva and Kropp indicates that the coverage was also explained orally in addition to the form.

¶ 37    Defendant lists a number of ways in which he argues the election form is deficient: "1) the description of uninsured motorist coverage in the Form differs from the description of uninsured motorist coverage in the policy and statute; 2) the text purports to describe both uninsured and underinsured motorist coverage in one sentence; 3) the text refers to 'selected limit' but no limit information or policy limit amounts appears on the Form; 4) the term 'bodily injury protection' is undefined; 5) the caption 'Uninsured Motorist Bodily Injury Election' does not contain the term 'uninsured motorist coverage' or 'underinsured motorist coverage'; 6) the text states the insured 'has been offered' uninsured motorist [coverage] but no evidence of the offer terms exist on the Form (eg. premium rates for different limits); 7) the text references 'the rates shown below' but no rates are shown on the Form; 8) the signature on the Election Form for the subject renewal policy may not bear Hodjaeva's signature as she testified 'I don't know' when asked under oath whether it was her signature; and 9) [t]he Election Form purports to have made an 'offer,' and thus ASI puts in issue the adequacy of its offer." We cannot find that defendant's list of the election form's purported deficiencies renders the form ambiguous or inaccurate.

¶ 38    First, some of defendant's claims are contradicted or explained by the record. For instance, his claim that the signature on the election form "may not bear Hodjaeva's signature" overlooks Hodjaeva's repeated testimony that she signed the form. Additionally, Giles explained in his deposition that the reference to "rates shown below" applied to an election of coverage in excess of the statutory minimum, which was not applicable in the case of CSC's policy.

¶ 39    Second, defendant's issues with the language of the form are unavailing. For instance, defendant takes issue with the same form discussing both uninsured and underinsured motorist coverage. In his brief, defendant states that "UM coverage cannot be this 'or' that. It is one or the other." However, defendant misses the point of the election form. While the form purports

to define "Uninsured Motorist Bodily Injury coverage," it states that protection is provided "for injuries in an accident caused by another motorist" (1) "who is not covered by any bodily injury liability insurance policy," or (2) "who is insured but such coverage is not adequate to compensate for the injuries sustained." In other words, it offers protection in either of the two scenarios. Despite defendant's urging otherwise, we see no other way that this can be interpreted. While the title of the form could be clearer by including reference to underinsured coverage, the description of the actual protection provided by the policy is accurate and clear.

¶ 40   Third, we reject defendant's arguments concerning the "offer" made by ASI. As noted, our supreme court has stated that the burden is on the insured to reject higher uninsured motorist coverage and the insurer does not have the responsibility of making an offer of higher limits, as was the case with earlier versions of the Insurance Code. *DeGrand*, 146 Ill. 2d at 533. Thus, defendant's challenges to the adequacy of the "offer" are irrelevant to our consideration of the adequacy of the election form.

¶ 41   Moreover, even if the election form was flawed, deposition testimony demonstrates that Hodjaeva made a knowing election to reject higher coverage limits. Defendant claims that Kropp's and Hodjaeva's testimony indicates that Kropp did not accurately explain uninsured and underinsured motorist coverage to Hodjaeva. We do not find this argument persuasive. Hodjaeva testified that she recalled Kropp talking about uninsured and underinsured coverage and that Kropp "explained the form and what I signed." Hodjaeva further testified that Kropp explained that higher coverage was available if the driver wished to insure himself more than was required. Hodjaeva testified that she "did understand the coverage options" and made the choice to reject higher coverage "[b]ased on my understanding [of the options] and based on Teri's explanation." She testified that she rejected the higher limit because "[t]he driver didn't want to pay more."

¶ 42   Similarly, Kropp testified that she was familiar with uninsured and underinsured motorist coverage and that the insurance companies "gave us the policies, the amounts, the limits. And that's how we wrote it. *** And we explained that all at the time to the insured." Both Kropp and Hodjaeva were able to recall the "20/40" statutory limit, despite the fact that Kropp was retired and CSC was no longer in existence. Additionally, Giles also testified that ASI's policy was to issue a policy with limits equal to the limits of bodily injury liability unless it received a form rejecting the higher limits. Accordingly, we agree with the trial court that ASI complied with the Insurance Code and Hodjaeva's election of the minimum limits for uninsured and underinsured coverage was valid.

¶ 43   Finally, we address defendant's claims that the trial court improperly struck portions of Giles' and Pitalis's testimony and Leatzow's affidavit. The parties disagree as to the standard of review to be applied, with ASI arguing for an abuse of discretion standard of review, and defendant arguing for a *de novo* standard of review. However, our conclusion would be the same under either standard of review. In the case at bar, the court concluded that both Leatzow's affidavit and Pitalis's testimony contained "a statutory interpretation of Section 143a-2, and [were] not proper," and so struck them. The court also agreed with ASI that Giles' testimony that the election form was no longer used by ASI "implicate[d] the prohibition against the use of post-remedial measures" and so struck that portion of Giles' testimony.

¶ 44   We agree with the trial court that both Pitalis and Leatzow merely provided their opinions as to whether ASI's election form was sufficient under the requirements of the Insurance Code and so were appropriately stricken. See *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1058

(2001) ("An expert witness *** is not competent to give testimony amounting to statutory interpretation. [Citation.] Nor may an expert witness testify with respect to legal conclusions."). Additionally, although not mentioned by the parties or the trial court, as noted, Leatzow's "affidavit" is not signed or notarized. Accordingly, it is not an affidavit at all.

¶ 45    With respect to Giles' testimony that the election form was no longer used "[b]ecause I got tired of paying lawyers to sit through depositions in defense of this form and decided that using the standard form would help me reduce my costs," defendant argues that the prohibition against evidence of subsequent remedial measures does not apply in contract cases and also argues that it was admissible for the purpose of proving feasibility of other measures where disputed by ASI. However, even if defendant was correct, we fail to see the relevance of Giles' testimony on this point. The issue in the case at bar is whether CSC knowingly elected to reject higher uninsured and underinsured coverage limits. Hodjaeva testified that she understood the form and that it was further explained to her by Kropp. Consequently, Giles' testimony as to ASI's later abandonment of the form is not relevant.

¶ 46    In the case at bar, the trial court properly found that ASI's election form was not ambiguous and the record reflects that Hodjaeva knowingly chose to elect the minimum limits of uninsured and underinsured coverage limits. Since the limits of the other driver's liability policy were higher than the limits of CSC's underinsured coverage, the underinsured coverage was not triggered as a result of defendant's accident. Accordingly, we affirm the trial court's grant of summary judgment in ASI's favor.

¶ 47                                   CONCLUSION

¶ 48    The trial court's grant of summary judgment in ASI's favor is affirmed where ASI's election form was not ambiguous and the record reflects CSC's president knowingly chose the minimum limits of uninsured and underinsured coverage.

¶ 49    Affirmed.